379 So.2d 912 (1980)
GLANTZ CONTRACTING COMPANY and Security Insurance Company
v.
GENERAL ELECTRIC COMPANY.
No. 51617.
Supreme Court of Mississippi.
February 6, 1980.
*913 White & Morse, D. Knox White, Gulfport, A. Morgan Brain, Jr., New Orleans, La., for appellants.
Eaton, Cottrell, Galloway & Lang, Charles R. Galloway, Gulfport, Lucien M. Gex, Jr., Waveland, for appellee.
Before PATTERSON, C.J., and BROOM and COFER, JJ.
BROOM, Justice, for the Court:
Overpayments made by prime contractor General Electric Company (GE), appellee, to sub-contractor Glantz Contracting Company (Glantz), appellant, during the progress of the sub-contract work on a large United States Government project (NASA) are in controversy here. Trial was in the Chancery Court of Hancock County wherein GE, complainant below, sued Glantz and its surety, Security Insurance Company. A $263,904.37 money decree plus six percent pre-judgment interest was awarded GE, and Glantz appeals. We affirm as to liability, but reverse in part as to pre-judgment interest.
Work done by sub-contractor Glantz was at the National Aeronautics and Space Administration (NASA) Mississippi Test Facility (MTF) in connection with the Apollo "moon landing mission." Speed in completion of the work was demanded by our government in order to "beat the Russians to the moon." The controversy evolved from the acceleration of the construction work aimed at immediate preparation for operations of the MTF near Bay St. Louis, Mississippi. Careful testing of Saturn rocket engines had to be accomplished at the MTF prior to their being attached to manned spacecraft at Cape Kennedy. NASA suggested to its MTF prime contractor GE that GE sub-contract certain chemical cleaning work of the cryogenic piping system with Glantz because NASA felt that only Glantz had the expertise and capability necessary to accomplish the work within the short time table allowed. NASA seemingly caused GE, without the time consuming public notice and bidding, to contract quickly *914 with Glantz on a "cost plus fixed fee" (CPFF) basis. Intense negotiations between GE and Glantz were compacted within a short time frame, Memorial Day weekend of May, 1965. The contract between Glantz and GE followed an unsuccessful attempt by NASA to contract directly with Glantz  when NASA could not agree with Glantz, Glantz was referred to GE for negotiations of the sub-contract. Glantz contends it was entitled to receive and retain payments made to Glantz by GE in the form of pro-rata home-office general administrative and overhead (GA&O) expenses regardless of whether such expenses were allocable to the NASA sub-contract work at MTF.
The instant suit was filed by GE against Glantz in order to recoup its over-payment mistakenly made to Glantz for which NASA would not reimburse GE, the net sum of $263,904.37. Glantz agrees it owes GE $52,895.20 and (along with Security) says the decree appealed from, to that extent, should be affirmed. Other facts will be stated as appropriate herein.
First issue is whether the chancellor correctly held that the General Electric-Glantz sub-contract required allocable costs to be determined as provided by NASA Procurement Regulations.
NASA would not contract directly with Glantz because Glantz insisted that NASA approve Glantz's "pool" concept of having NASA pay certain indirect overhead costs not related or allocable to the NASA project. NASA refused to approve the "pool" concept. As stated in its brief, Glantz insisted it simply would not undertake the job or enter into any contract unless it was paid an aggregate of (a) the fixed fee, (b) all site-related, i.e., "allocable," costs (direct and indirect), and (c) the pro-rata of all pertinent home-office GA&O pools, even if that included some of the very same types of indirect costs which are charged and reimbursed as "direct site" costs under item (b). Glantz takes the position that it and NASA orally agreed upon CPFF terms which would charge the full amount of all site-related ("allocable") costs, both direct and indirect, as "direct" and reimbursable, and also pay a pro-rata part of all home-office GA&O expenses, whether allocable or not. The non-allocable costs are the crux of the controversy. Glantz says that NASA specifically "understood and acquiesced in this," and on this basis Glantz argues it is entitled to payment for GA&O incurred at its home office in New York, and accounted for in its home office's GA&O.
GE argues that, based upon the black-letter language of the written contract between GE and Glantz, allocability to MTF project was not written out of their contract. Accordingly, GE contends that Glantz's GA&O costs not related to MTF are not chargeable to GE and therefore such charges mistakenly paid by GE to Glantz were properly included in the money decree in favor of GE.
GE's sub-contract with Glantz provides that only indirect costs "allocable" to the MTF work are to be paid Glantz by GE. Art. V of the sub-contract binds GE to pay the cost, as determined to be allowable pursuant to Part 15, Sub-parts 2 and 4 of the NASA Procurement Regulations. Article XIV, par. 1(d) provides that indirect costs to be paid shall include all items of indirect allowable cost found in Part 15 of the NASA Procurement Regulations. In the General Terms and Conditions, clause 27, par. (c) is the provision that allowability of costs and acceptability of cost allocation methods shall be determined in accordance with Part 15, Sub-parts 2 and 4 of the NASA Procurement Regulations. NASA Procurement Regulations, Part 15 (NASPR-15) provides in Sub-part 2, section 15.201-2 that factors to be considered in determining the allowability of individual items of cost include allocability. Section 15.201-4 reads:
15.201-4. Definition of Allocability. A cost is allocable if it is assignable or chargeable to a particular cost objective, such as a contract, product, product line, process, or class of customer or activity, in accordance with the relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it:

*915 (i) is incurred specifically for the contract;
(ii) benefits both the contract and other work, or both Government work and other work, and can be distributed to them in reasonable proportion to the benefits received; or
(iii) is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown.
NASPR-15 provides in section 15.202 that:
When items ordinarily chargeable as indirect costs are charged to Government work as direct costs, the cost of like items applicable to other work of the contractor must be eliminated from indirect cost allocated to Government work.
While the work was being done, GE paid Glantz as Glantz requisitioned GE including the MTF's pro-rata of all home-office GA&O pools, regardless of any MTF allocability. GE neither held back nor retained any sum from those payments. GE paid Glantz for everything Glantz billed as the work progressed without GE disapproving any of the non-MTF allocable GA&O costs included in bills submitted by Glantz. When Glantz completed its work as contracted, GE had paid Glantz all costs billed, and all of the fixed fee except a relatively small (about $24,000) retainage withheld by GE.
Subsequently, NASA audited the costs which GE had paid to Glantz under the CPFF sub-contract. Purpose of the audit was to determine what cost reimbursements NASA should make to GE under their CPFF prime contract. Pursuant to its audit, NASA disallowed the non-site-allocable GA&O costs which GE had been paying all along to Glantz as items "non allocable" under NASPR-15, supra. In accomplishing the disallowance as to GE, NASA withheld from GE whatever amounts NASA otherwise owed GE on subsequent payments, thereby paying GE less until such disallowed costs under the prime contract were completely recouped by NASA from GE. As a result GE was unable to make the same kind of set-offs under its sub-contract with Glantz because GE already had paid Glantz all but $24,000 of the total sub-contract funds.
Vital to the issue is whether or not language included in the sub-contract between GE and Glantz negated the "allocability" sections of NASPR-15 relating to general administrative and overhead (GA&O) expenses. Glantz's contention is that the language which was inserted by Marvin L. Schechter, attorney for Glantz, in sub-part (d) of Section XIV of the sub-contract between GE and Glantz[1] effectively limited the language of NASPR-15.
As a "hard money" or "lump sum" contractor, Glantz characteristically included a certain percentage of its estimated cost to cover its home office GA&O expenses not allocable to any particular job. In the sub-contract with GE, the original language without a doubt included the language of NASPR-15. The position of the witnesses for Glantz was that they expressed to GE (and NASA at the prior meetings) that they could not accept this sub-contract unless they were assured that this job would carry a proportionate share of the unallocable home office expense. Schechter stated that he inserted the language of Section XIV, sub-section (d) specifically to eliminate the allocability language of NASPR-15, but left the other references in the contract to NASPR-15 to relate to the "allowability per se" aspects. He further stated that he felt that his position was made clear to GE. GE paid all the costs billed to them by Glantz in full in the amount of approximately $2,765,480 plus all of the fixed fee of $111,940 except for $24,000 of the fixed fee which was withheld.
The significance and the ramifications of NASPR-15 are clearly established. Witnesses for Glantz, including its attorney, Schechter, testified that his sole purpose for inserting sub-section (d) of Section XIV was *916 to limit the impact of NASPR-15 and especially those points relating to allocability. We note that in its brief, Glantz relates much more argument to the negotiations between Glantz and NASA than to negotiations between GE and Glantz. Glantz argues that inasmuch as the language of the sub-contract between GE and Glantz was virtually identical to the unexecuted contract proposal between NASA and Glantz, NASA did not intend for GE to renegotiate the contract, but rather to simply implement the already negotiated contract between NASA and Glantz. This argument is without persuasion because the language inserted by Schechter simply does not do what he claims it does. As Schechter himself stated, the reason he put sub-section (d) of Section XIV was to eliminate the allocability requirements of NASPR-15 and that both NASA and GE understood this. Nevertheless, he inserted no specific words of limitation in the sub-contract to accomplish his stated purpose. It is obvious Schechter knew the effect of NASPR-15 and if it was plain to NASA and GE that he wanted the allocability requirements out, he could have simply supplied language that would unambiguously and unequivocally have removed the allocability language. If NASA and GE understood his position and agreed to it, then surely they would not have objected to such plain, definitive wording.
The record does not reflect negotiations between GE (or NASA) and some uninformed, inferior, or easily swayed person. Mr. Schechter was an attorney and by his own admission was not dealing with the technical side of the contract, only the legal aspect of it. Even though the contract dealt with a subject that would seem somewhat exotic to the average person, the legal aspect remained the same. Glantz emphasizes the "time pressure" atmosphere in which negotiations took place, but the facts show time pressure focused upon NASA and GE, not Glantz. Glantz could have simply left at any point in the negotiations and not signed any contract, as Schechter threatened to do.
Another weak aspect of Glantz's argument is the fact that left in Section XIV (a) was the requirement that Glantz develop a "cost accounting" system. As Glantz pointed out, they already had an accounting system, though not a cost accounting system, therefore there would have been no need to develop a cost accounting system if allocability was not still a criteria of allowability.
For us to construe the Glantz-GE sub-contract so as to read out of it the allocability requirements would be more than a strained interpretation. As we said in Citizens National Bank of Meridian v. Glascock, Inc., 243 So.2d 67 (Miss. 1971):
Courts do not have the power to make contracts where none exist, nor to modify, add to, or subtract from the terms of one in existence.
(243 So.2d at 70).
The contract before us was amended and then approved by an experienced attorney (not experienced in CPFF contracts, but in general contract law at the very least) and this Court would not be justified in adding words to the contract. Every reference to NASPR-15 in the contract, even the ones inserted by Schechter, refer to the regulation in general. There are no specific words of limitation in any provision, and thus we cannot rule that all sections of NASPR-15 are not applicable to this contract. In our opinion, the language inserted by Schechter did not remove the allocability requirements of allowability, whether he wished it to or not. It cannot be said the chancellor was manifestly in error in so holding, and therefore the first issue is resolved in favor of GE.
The second proposition argued by Glantz is that the chancellor erred in not holding that GE's only contractual remedy for recouping subsequently disallowed payments was by set-off against any further payments due thereafter, not by an affirmative action for money recovery and that such set-off remedy has been waived by GE.
Glantz bases its contention on Article V, sub-section (b) of the contract between GE and Glantz, which states:

*917 At any time ... prior to final payment ..., the Government may have the invoices ... of cost audited. Each payment theretofore made shall be subject to reduction for amounts included in the related invoice ... which are found by the Government, on the basis of such audit, not to constitute allowable cost. Any payment may be reduced for overpayments . . on preceding invoices...." (Emphases added).
According to Glantz, GE's remedies (as to Glantz) are exclusively limited to set-offs against future payments due Glantz under the contract with GE. Glantz asserts that Article V(b) being the only section dealing with recoupment of overpayment, no other remedies can be implied from the contract, and that since GE has made all payments required under the contract, GE has waived this remedy.
Cases cited by appellant on this point are distinguishable from the instant case, and are not controlling. The general rule is stated in 17 Am.Jur.2d, Contracts, § 522 (1964):
Where, however, there is no express or implied limitation in the contract making the stated remedy exclusive, the prevailing view seems to be that a party may at this election pursue either the prescribed remedy or any other remedy the law gives, although there is authority to the contrary.
Noteworthy is the fact that the remedy provided in the GE-Glantz contract is couched in permissive terms "may" rather than the mandatory language "shall." Glantz states that it makes no difference but we do not agree. Had the contract mandated that GE "shall" do something, then if that was the only remedy allowed for in the contract it might be exclusive, but such is not the case presented. Courts must construe contracts so that they give effect to all provisions and do not produce an unfair and unreasonable result. Citizens Bank v. Frazier, 157 Miss. 298, 127 So. 716 (1930). To hold that the remedy allowed for in the contract would be exclusive in the present case, would be unfair, unreasonable and unjust and we find no merit to the second proposition argued.
Third argument made by Glantz is the assertion that GE has no equitable remedies for recoupment of the payment it made for subsequently disallowed costs, because such remedies are barred by the "volunteer" rule. The "volunteer" rule is stated in McDaniel Bros. Construction Co., Inc. v. Burk-Hallman Co., 253 Miss. 417, 175 So.2d 603 (1965):
[A] voluntary payment can not be recovered back, and a voluntary payment within the meaning of this rule is a payment made without compulsion, fraud, mistake of fact, or agreement to repay a demand which the payor does not owe, and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against such demand.
(253 Miss. at 423, 175 So.2d at 605).
The problem, then, is to determine whether the overpayments made by GE under the contract which is the subject of the dispute in this case, were made under the "volunteer" rule. It is assumed arguendo that the overpayments by GE to Glantz are in fact due back to GE, and thus the entire issue would be whether the "volunteer" rule acts as a bar to the restitution.
At least two reasons preclude application of the "volunteer" rule in this case. First, the payor must have full knowledge of all the facts which would render the payment voluntary. See 66 Am.Jur.2d, Restitution and Implied Contracts, § 95 (1973). In the case at bar, it seems obvious that GE could not have full knowledge of the facts, i.e., whether or not payments made were in actuality valid payments, without an audit of the transactions between the parties. It is also obvious that such an audit was at the discretion of the government, and not GE. Both Glantz and GE appear to have fully understood that an audit of the contract would be made by the government at the end of the performance of the contract. At such time, there would be made any adjustments that needed to be made to the payments under the contract. Second, the determination *918 of whether payments are made on a voluntary basis depends on the facts of the particular case and whether such facts indicate an intent on the part of the payor to waive his rights. As held in Cheshire Oil Co., Inc. v. Springfield Realty Corp., 385 A.2d 835 (N.H. 1978):
[T]he payment of money or the making of a contract might be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid or excuse him from performing the contract.
Here, it can be seen that GE was under extreme compulsion and pressure from NASA to implement the contract for the cleaning of the cryogenic system and also to finish the cleaning of the cryogenic system. Obviously had GE attempted to audit each month's billing and then determine whether the payments made under it were indeed allowable, a subsequent interruption of work would probably have occurred on Glantz's part. Under the exigencies of the situation in which GE found itself, to attempt at the end of each monthly billing to accurately determine whether such payments were indeed valid was not feasible. Further, it has been held that time constraints under which payments are made can operate to keep the payments from being voluntary. Johnson v. City of Brockton, 391 N.E.2d 940 (Mass. App. 1979).
Careful consideration of the facts of the case at bar and the situations which faced GE and Glantz in carrying out the contract between them leads us to conclude that it would have been unreasonable for GE to have to attempt to determine exactly whether payments were allowable under the contract at the time of each monthly billing. This would seem to be especially true in light of the fact that the accounting system which Glantz had might not have enabled GE at that time to accurately make a determination of whether such costs were allocable and allowable. Upon the testimony and evidence introduced at trial, our opinion is that it cannot be said the chancellor was in error in determining that GE had not waived its rights to recover these payments on the basis of the "volunteer" rule.
Fourthly, Glantz contends that the lower court erred in awarding GE pre-judgment interest pursuant to Mississippi Code Annotated § 75-17-1 (1972) on the sum it was allowed to recover. In a number of cases we have addressed the question as to whether pre-judgment interest should be allowed. O.J. Stanton v. Dennis, 360 So.2d 669 (Miss. 1978); Home Ins. Co. v. M.T. Olmstead, 355 So.2d 310 (Miss. 1978); State Farm Mutual Automobile Ins. Co. v. Bishop, 329 So.2d 670 (Miss. 1976); Commercial Union Ins. Co. v. Byrne, 248 So.2d 777 (Miss. 1971).
In making the determination of whether such interest is allowable under these cases, considerable discretion is vested in the trial courts, giving due attention to the peculiar facts and circumstances of the particular case. As held in Home Ins. Co., supra, pre-judgment interest should be allowed "where the denial of the claim is frivolous or in bad faith." Our study of the record here leads us to the conclusion that there was a legitimate dispute between the parties and we cannot say on the facts of this case that Glantz's delay in making repayment to GE was either an exercise in bad faith or frivolity. To the contrary, Glantz pursued an administrative appeal before the NASA Board of Contract Appeals and the United States Court of Claims and GE at least approved of the appeals and acquiesced in them. Glantz agrees the six percent pre-judgment interest should apply to the $52,895.20 admittedly owing by Glantz to GE.
The original bill of complaint in this cause was filed October 19, 1967 and the final decree was not entered until November 30, 1978. During this time frame, the Board of Contract Appeals decision was entered July 19, 1973 and the decision by the United States Court of Claims was entered April 27, 1976. In pursuing the administrative appeals, Glantz appears to have been doing so completely in good faith regardless of the fact that it may have had a vested interest. In such a situation, equity will *919 not condone the allowance of pre-judgment interest. Under Stanton, supra, we held that upon the peculiar facts of the case a legitimate dispute existed between the parties, and we cannot say that in denying GE's claim Glantz was acting frivolously or in bad faith. Therefore, there is merit to Glantz's contention that GE should not have been awarded prejudgment interest, except as to the sum admittedly due GE.
We affirm the decree appealed from except for the allowance of pre-judgment interest. To that extent the decree appealed from will be modified here so as to exclude all pre-judgment interest except as applies to $52,895.20 which Glantz agrees is due GE.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, LEE, BOWLING and COFER, JJ., concur.
NOTES
[1] Sub-part (d) of Section XIV reads as follows: "(d) Payment of indirect costs covered in 1(a) above shall include all items of indirect allowable cost found in Part 15 of the NASA Procurement Regulations."