Charles W. McCAIN and Charles D. Shipp, Plaintiffs,

v.

R. E. COX and John Hancock Mutual Life Insurance Company, Defendants.

No. DC 80–10–WK–P.

United States District Court,
N. D. Mississippi,
Delta Division.

Feb. 10, 1982.

F. Ewin Henson, III, Clarksdale, Miss., Warner Hodges, Memphis, Tenn., for plaintiffs.

Joel P. Walker, Hernando, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In this diversity action, plaintiffs Charles McCain, a resident of Tennessee, and Charles D. Shipp, a resident of Mississippi, sue defendant R. E. Cox, a resident of Arkansas, seeking damages for his refusal to consummate a real estate transaction pursuant to a May 4, 1979 contract.[1] In defense, Cox maintains that he possessed the right to terminate the transaction and that plaintiffs or their agents misrepresented the condition of the land. Cox counterclaims for expenses incurred in the transaction. After full evidentiary hearing and consideration of legal memoranda, we make findings of fact and conclusions of law as follows:

## I. FINDINGS OF FACT

(a) *Narration of Events*

In December 1978, Shipp, an independent loan correspondent for various insurance companies, learned that John Hancock Mutual Life Insurance Company was interested in selling some of the lands it owned in Hyde County, North Carolina, known as Mattamuskeet Farms. McCain, a buyer and seller of farm land who often worked with Shipp, met Jack Cozart of West Memphis, Arkansas, a land dealer who was interested in arranging an exchange of agricultural property for 250 acres of commercial land in DeSoto County, Mississippi, on behalf of Cox, its owner.[2] McCain, Shipp and Cozart discussed a possible trade of the

---

1. Plaintiffs originally joined John Hancock Mutual Life Insurance Company, a Massachusetts corporation, as a party defendant seeking specific performance of land purchase contracts, but the company was dismissed upon discovery that it had sold the farm land to another party.

2. Though this tract is often referred to as 250, or 252, acres, Cox could deliver clear title to only 216 acres, a fact known to McCain and Shipp from the beginning of negotiations.

North Carolina and Mississippi property. After contacting Clarendon Richert, John Hancock's chief farm loan officer, plaintiffs learned the company would sell some of the property, and in January 1979 McCain, Shipp and Cozart viewed the land.

Mattamuskeet Farms consisted of approximately 35,000 acres of flat, coastal land, large portions of which were marshy swamplands lying in the headwater regions of the Alligator River flowing near the north boundary. The Atlantic Intracoastal Waterway borders the west side, and Pamlico Sound lies to the east. Some years previously road beds had been constructed for timber harvesting operations; later blocks of land were formed by a network of large drainage canals, originally laid out at one mile square intervals. As the land was developed for farming, field or "V" ditches constructed prior to 1975 drained the immediate area into canals where the water was pumped into nearby watercourses. The existing "V" ditches were cut 5 feet deep and laid out 330 feet apart. In 1977 the Mattamuskeet Association was formed to maintain the roads and drainage and levied annual assessments for this purpose. Only a part of John Hancock's acreage was in cultivation or cleared, while other portions of uncleared land had no ditches. Most of the farm's land surface was covered with layers of peat ranging in depth from several inches up to eight feet. No excavation or mining of peat had ever taken place.

Mattamuskeet Farms was managed by the Rich Company, directed by William D. Rich. Rich also served as president of Mattamuskeet Association, and was familiar with the farm's drainage system. Rich had cleared several hundred acres of woodland after becoming connected with Mattamuskeet Farms in 1977 but had not dug additional canals or ditches.

Since the January 1979 trip was McCain's and Shipp's first visit to the property, they instructed Cozart to make pertinent inquiries of Rich concerning the land. Rich showed Cozart aerial photos and a property map maintained at the farm headquarters. This map, coded in four colors, depicted varying states of land development as follows: (1) land in cultivation; (2) land cleared but not in cultivation; (3) land with canals, roads and "V" ditches; and (4) land with canals and roads but no ditches. As shown on the map, about 5,300 acres were unditched. Cozart was furnished a small map and brochure. Leon Williams, Rich's employee, drove plaintiffs and Cozart over the property and showed them the drainage system. Cozart took soil samples and photographs of the area to discuss with Cox.

The next week, on January 29, Cozart returned with Cox to view the property. Rich flew them over the entire farm for about 45 minutes in his airplane, and then drove them around the property. He explained the type of land and different stages of development. Cox and Cozart reviewed property maps and acreage figures at Rich's office, and the three discussed basic farming, including types of crops grown, yield history, soil types, and saleability.

Cox became interested in trying to acquire 15,000 acres in woods and 5,000 acres cleared land. At Cozart's request, Shipp arranged a February 7 meeting at John Hancock's office in Memphis, Tennessee, to discuss a sale as well as a loan to finance land clearing expense. This meeting was attended by Richert, Gene Austin, another John Hancock official, Cox, Cozart, and plaintiffs. Richert stated that the company had available for purchase approximately 12,000 acres in woods, of which 2,000 acres were not ditched. The tract was identified in yellow color on a small map of Mattamuskeet Farm given to Cox. They discussed a purchase by Cox at $546 per acre for a total consideration of $7 million less $2 million allowed as credit for Cox's DeSoto County land. Richert told Cox and Cozart that they would have to deal with Shipp and McCain, and not John Hancock, as sellers of the land, but indicated that if Cox bought the land from plaintiffs, the company would make him a loan to clear the property.

Cozart continued to dicker with McCain and Shipp about a sale to Cox, who, on

March 2 submitted a signed purchase proposal, which they rejected. Upon the advice of Warner Hodges, their attorney, plaintiffs delayed further negotiations until they made a firm purchase contract with John Hancock on April 24. Under this contract, plaintiffs were to pay the company $390.59 per acre for 12,000-odd acres, the exact acreage to be determined by survey, with $500,000 payable in cash at closing on June 15, and the balance evidenced by their promissory note secured by first deed of trust on the land. Plaintiffs paid John Hancock $5,000 earnest money at time of execution of the agreement.

Ten days later, on May 4, plaintiffs and Cox signed a contract for Cox to purchase the same lands. This contract was signed in West Memphis, Arkansas, in the office of Jake Brick, an attorney Cozart engaged to represent Cox's interest. Later the same day Cox and his wife signed a loan commitment with John Hancock for land clearing. By his contract with plaintiffs, Cox, who put up a $10 nominal sum as earnest money, was required to pay a purchase price of $6,771,500 for the 12,000-acre tract by conveying them the DeSoto County property for a credit of $2 million, paying $500,000 cash to John Hancock at the June 15 closing, and assuming their deed of trust to John Hancock for $4,271,500. The contract contained the following relevant provisions:

9. Buyer has until June 1, 1979 to inspect the property and satisfy all contingencies set forth hereinafter in paragraph nine (9), [sic] designated Contingency. If contingency is not satisfied by that date Buyer shall notify Seller in writing if Buyer fails to notify Seller in writing by June 1, 1979, then all matters set forth in paragraph nine (9) are waived or deemed satisfied and a binding contract is in affect [sic]. Each party shall have the right to specific performance and all other rights arising by the failure of one party to close.

. . . . .

11. *CONTINGENCY.* Anything herein to the contrary notwithstanding, this Real Estate Contract shall be binding upon the Buyer only after Buyer has approved the legal description to be furnished by Seller to Buyer, it being understood that Buyer intends to examine and approve the exact land to be conveyed both as to boundaries and Buyer's intended use, and shall not be bound until such examination and approval is made. If Buyer fails to approve, Buyer's earnest money, upon demand, shall be returned and this contract shall be null and void.

12. CHARLES W. McCAIN or CHARLES D. SHIPP has the right to put a loan on the Two Hundred Fifty-two (252) acres of land located in DeSoto County, Mississippi, in the amount of Five Hundred Thousand and no/100 ($500,000.00) and if this cannot be obtained, this contract will become null and void and both parties shall be held harmless from this Contract.

13. Promptly after the execution of this Contract Buyer will, at its expense, have the above described land surveyed by Rodman and Waters Land Surveying and Civil Engineering of Washington, North Carolina and twenty (20) prints of a map on such survey shall be furnished by Buyer to Seller no later than June 1, 1979. The Surveyor's finding as to acreage shall be used in computing the total purchase price and the description as determined by said survey shall be used in the Deed and Deed of Trust.

Paragraph 9, which placed a June 1 time limit on the buyer's exercise of contingencies, was inserted at Hodges' suggestion, while ¶ 11, headed Contingency, was insisted upon by Cox. Though ¶ 12 did not so specify, the undisputed evidence is that the parties contemplated that Cox would not put up his own money to close the deal, but that plaintiffs would borrow funds for the down payment and lend the money to Cox. Cox was to reimburse plaintiffs by giving his note and second deed of trust against the North Carolina land.

On May 2, plaintiffs' contract with John Hancock was modified to condition completion of their deal upon concurrent closing of plaintiff's contract with Cox. On June 14

the contracts were again amended to restrict cutting of certain timber. A more significant modification, however, concerned the peat reservation by John Hancock. In mid-May, Cox became concerned with the adverse effect that peat mining, if it ever occurred, might have on farming operations. Consequently, he had Cozart retain William Carter, Jr., a Washington, North Carolina attorney, to determine the legal effect of the peat reservation. On May 23, Carter advised Brick as to his opinion on the status of peat under North Carolina law. Since the status of peat as a mineral was unclear, Brick wrote plaintiffs on May 31, and requested a ten-day extension of the June 1 deadline to resolve the issue. Plaintiffs consented to this request. After conferring with James McMullen, John Hancock's North Carolina attorney, Carter suggested an amendment to protect Cox from surface damage caused by peat mining under John Hancock's reservation. This amendment was approved by all parties. On June 4, Hodges, on behalf of plaintiffs, wrote Brick and stressed that the 10-day extension was granted only to resolve the peat question and that plaintiffs considered any other objections to the contract by Cox as waived. Although plaintiffs granted Cox no further extensions to exercise contingencies, delay in obtaining the property survey required them to consent to several postponements of the June 15 closing date, since, notwithstanding the $7 million purchase price specified in the May 4 contract, the actual price calculated at $546 per acre was to be controlled by survey.

Upon noticing from a review of the aerial photographs that all ditches did not appear the same, Cozart, on or about June 20, met with Williams in North Carolina to examine ditch sites. He then discovered that many areas which he and Cox previously thought were ditched merely had marked rights-of-way for ditches; hence 5,300 rather than 2,000 acres were unditched. Cozart reported this to Brick who notified Hodges by letter on June 26. Hodges took the position that the contract did not mention ditches. Cox made no protest at that time about the lack of ditches.

In mid-July, Hodges informed plaintiffs that North Carolina law prohibited a mortgagee from holding the mortgagor personally liable for deficiency in the event of foreclosure and advised them not to lend $500,000 to Cox against the North Carolina land. Therefore plaintiffs decided not to borrow money on the DeSoto County property. During a July 21 meeting with Cox and Cozart in Osceola, plaintiffs asked Cox if their failure to borrow the money would "queer" the deal. Cox replied that this would not necessarily terminate the contract and he would try to come up with the funds for down payment. They also discussed the 5,300 acres of unditched property. Plaintiffs told Cox that they would ask John Hancock either to ditch the land or give a credit of $81 per acre for the unditched portion. Nothing came of this suggestion.

From the outset, Cox had intended to keep no more than 4,500 acres of the North Carolina property and assign the remainder of his contract rights to others. In fact, Cozart had been showing the land to prospective purchasers since April. When Cox learned that plaintiffs did not intend to borrow the $500,000, he believed he could raise the money by securing down payments from these purchasers. Cox proceeded to execute and place in escrow instruments conveying McCain and Shipp clear title to the DeSoto County land to be delivered upon contract closing. Cozart continued to solicit buyers for portions of the North Carolina land who began to inquire if there were permits to drain the land. On August 27, Brick received the property survey which Cozart had ordered in mid-June.

Representing their respective clients, Hodges, Brick, Carter and McMullen agreed upon a closing of both purchase agreements at Washington, North Carolina, on August 30. Cox was expected to make the $500,000 cash payment and also pay approximately $172,000 for the loan commitment fee and closing costs. The necessary papers and documents were prepared for execution and all persons were present except Cox, his

wife, and Cozart, yet Brick had informed them of the meeting. Carter was present, however, purporting to represent Cox. When Cox did not appear, Carter telephoned Brick and learned that Cox had been detained in Arkansas as a witness in a criminal trial. When plaintiffs and Hodges returned home, they found letters dated August 27 from Cox and James Hyatt, Cox's Osceola attorney, asking them to delay closing until Cox received the property survey and approved the land as to boundaries, buyer's intended use, and other items provided by ¶ 11 of the contract. When Brick attempted to reschedule the closing for September 13, Cox countermanded this on September 5 by writing the parties that he had just received the survey and intended to inspect the property on September 6 and then indicate his approval or disapproval. On September 7, Hodges responded to Cox stating that Cox's deadline for exercising any contingency had expired June 1, and that he was expected to close at the earliest possible date, especially since he had delayed having the survey begun until late June. Nonetheless, Cox attempted to inspect the North Carolina property again, but was prohibited from doing so by a hurricane in the area. On September 12, Cox again wrote to Hodges and plaintiffs and stressed his right to examine and approve the property under the contingency clause of this contract, that he had made no election whether to proceed or not, and that no final action could be taken until he did.

After Cox notified plaintiffs of his position, he first learned in September that no § 404 ditching permits required by Federal Water Pollution Control Act, commonly referred to as the Clean Water Act, to construct new ditches had been issued by the United States Army Corps of Engineers. When Cox contacted plaintiffs about the problem, he was again referred to Rich. Rich advised Cox by letter dated August 19 (but not received by Cox until mid-September) stating that all pumping stations and outfall canals had been constructed with permission of proper governmental authority. On September 27, Rich forwarded to Cox copies of permits previously acquired from the Corps of Engineers. None of these permits, however, constituted § 404 permits to construct additional "V" ditches. Without such permits, or exemptions, Cox was unable to interest any prospect in buying a portion of the unditched property. In mid-October, plaintiffs, Cox, Cozart and Hyatt met in Osceola to confer about the lack of § 404 ditching permits. At this meeting Cox informed plaintiffs of his inability to resell any portion of the property to raise the $500,000 cash down payment for John Hancock. Shipp telephoned Richert at his Boston office and was told that Cox should attempt to secure permits in his own name. On September 18, Hyatt wrote Charles Hollis, Chief of Regulatory Functions for the Corps of Engineers at Wilmington, North Carolina, inquiring about obtaining permits to ditch the land. On November 14, Hollis confirmed that the unditched land was subject to Corps of Engineers jurisdiction and could not be ditched without a § 404 permit.[3]

3. Section 404 of the Federal Water Pollution Control Act, 33 U.S.C. § 1344, provides in part:

(f)(2) Any discharge of dredged or fill material into the navigable waters incidental to any activity having as its purpose bringing an area of the navigable waters into a use to which it was not previously subject, where the flow or circulation of navigable waters may be impaired or the reach of such waters be reduced, shall be required to have a permit under this section.

The applicable regulation, 33 CFR § 323 (1980), includes wetlands as navigable waters. Wetlands are defined as

[t]hose areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adopted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

Upon inspection of the unditched John Hancock property, the Corps of Engineers determined that it was wetland, thus requiring a § 404 permit before ditching. According to Hollis, the other land had been ditched prior to the 1972 amendments to the Act and court decisions requiring the Corps to exercise jurisdiction over wetlands. *Conservation Council of North Carolina v. Costanzo*, 398 F.Supp. 653 (E.D.N.C.1975); *P. F. Z. Properties, Inc. v. Train*, 393 F.Supp. 1370 (D.D.C.1975). Since

In December 1979, the parties met in North Carolina with Curtis Joyner, John Hancock's agricultural investment officer, to discuss § 404 permits. Joyner took the position that John Hancock would handle permit applications on the undltched land and that Cox should refrain from further attempts to procure them. Nevertheless, Joyner proposed that John Hancock would substitute other land already ditched which was not subject to the Corps' jurisdiction. John Hancock offered a total of 8,761 acres, consisting of 1,571 acres of cleared land with ditches, roads and canals at $800 per acre and 7,190 acres of timberland with ditches, roads and canals at $500 per acre. Cox purported to agree to this arrangement whereby the contract for the overall sale price, terms and loan commitment to Cox would otherwise remain the same. No new written agreement was prepared. Upon returning to Osceola, Hyatt contacted Joyner to confirm the new agreement, but was advised that the sale was still to be handled through McCain and Shipp. Plaintiffs met with Cox and explained that the price quoted by John Hancock on the substituted land was not the complete purchase price, and that Cox still had to trade the DeSoto County property as their "boot." The parties reached an impasse with Cox saying that he would not give his land away and plaintiffs stating that they would seek legal action. Shortly thereafter this action was filed.[4]

### (b) *Factual Disputes*

Although the foregoing narrative is basically undisputed, the evidence presents material conflicts in certain respects. A basic issue concerns whether representations were made to Cox and Cozart that all land was ditched or, if not, that all necessary ditching permits, or exemptions, had been obtained. At trial, Cox and Cozart stated that in January 1979 Rich made such representations to them. Cox further testified

that plaintiffs also made these statements, but Cozart said they did not. Plaintiffs denied making any such representations, stating that they referred Cox and Cozart to Rich for any questions about the property. Rich denied making any statements to Cox or Cozart that all land was ditched or that no further permits would be necessary for its development. Rich did admit, however, to showing them property maps which accurately depicted the state of the property. Plaintiffs confirmed this was done during their initial trip with Cozart and stated that they heard Rich make no statement that all the land was ditched. Any statements by Rich as their agent for this purpose would be attributable to McCain and Shipp. Both plaintiffs and Rich, however, stress that the subject of ditching permits never arose in any discussions with Cox or Cozart prior to the execution of the May 4 contract. Indeed, the evidence indicates that plaintiffs and Rich were unaware that governmental permits were at all necessary. Despite Cox's and Cozart's assertions, we believe the testimony of plaintiffs and Rich to be more credible and find as a fact that plaintiffs and Rich neither represented that all land which Cox proposed to buy was ditched nor made any reference whatever to ditching permits. Any misunderstanding by Cox or Cozart concerning ditches most likely was the result of their own erroneous interpretation of maps in Rich's office. Cozart, who had become very familiar with the property after numerous trips to North Carolina, realized in mid-June that there were 5,300 acres of undltched property. This occurred when Cozart studied aerial photographs in connection with the timber amendments. Williams, Rich's employee, agreed that ditch rights-of-way were designated on the map in a manner similar to ditches in place. The company's brochure stated that the property was suitable for agricultural use and had a drainage system of field ditches and canals adequate to drain

the ditched land was no longer wetland, a § 404 permit was not required.

4. By way of sequel, John Hancock in 1980 sold a portion of the undltched land to another par-

ty who attempted to install ditches and was met with a cease and desist order from the Corps of Engineers until § 404 permits were issued.

the entire property in 24 hours. Despite any misunderstanding they might have had from the map and brochure, both Cox and Cozart were told by Richert at the February 7 clearing loan meeting that 2,000 acres were not ditched. Though Richert was mistaken as to the number of acres, Cox and Cozart were clearly put on notice that a substantial portion of the property to be sold remained unditched. They do not contend that Richert made any statements about permits, Consequently, we find as a fact that as of February 7, Cox was aware that a material part of the land needed to be ditched. Furthermore, we find that no representations whatever about ditching permits were made to Cox at any time prior to his signing the purchase agreement. Of course, the lack of lateral ditches, per se, was of little consequence. It was the lack of drainage permits, or exemptions, to install more ditches that was of utmost importance, for without them the unditched acres could not be lawfully drained for cropland.

The court further finds as a fact that McCain and Shipp were not agents of John Hancock in trading land to Cox but were acting on their own. The contract documents clearly reveal that plaintiffs agreed to purchase the property at one price ($5 million), by paying cash and signing notes and to resell it to Cox at a greater price ($7 million). These obligations negate the idea that plaintiffs were acting as John Hancock's agents. Moreover, John Hancock consistently refused to deal directly with Cox and insisted that it would deal only with plaintiffs.

The court further finds as a fact that Brick and Carter were authorized to act as attorneys for Cox in obtaining contract amendments, procuring extensions, and setting dates for closing. Although they were employed by Cozart, Cox was aware of their involvement, he accepted the benefits of their services, and he did not disavow their authority until his letters of August 7 and September 5. Despite Cox's seeking to repudiate the acts of Brick and Carter, the court finds that this position taken at trial is wholly inconsistent with his actions for nearly four months, from May to late August 1979.

## II. CONCLUSIONS OF LAW

The court must initially determine which state's law is controlling since the contract does not specify the law to govern its construction. The action having been filed in this court, the conflicts-of-law rules of the forum state are applicable. *Klaxon Co. v. Stentor Electric Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Mississippi has adopted the "center of gravity doctrine" under which the court applies the law of the state which has the most significant relationship with the event, parties, and the parties' liabilities and rights. *Craig v. Columbus Compress & Warehouse Co.*, 210 So.2d 645, 649 (Miss.1968); *see Spragins v. Louise Plantation, Inc.*, 391 So.2d 97 (Miss.1980). Five states—Arkansas, Tennessee, Massachusetts, North Carolina and Mississippi—have some relationship to the controversy, but North Carolina and Mississippi are most involved because realty located in both states formed the basis of the transaction. Though much of the dispute concerns issues regarding North Carolina land, that property is no longer subject to the control of either party and will not be affected by the outcome of this action. On the other hand, the Mississippi property is still owned by Cox and could be indirectly affected by our holding. Moreover, the rights of Shipp, a Mississippi resident, are directly in issue, while no resident of North Carolina is affected. Although we find little difference in the applicable Mississippi and North Carolina law, we conclude that Mississippi law controls interpretation of the contract. "[I]n case of doubt as to whether the lex loci or the lex fori should govern, the court will naturally prefer the laws of its own state or country." *Craig, supra* at 649. Questions of merchantability of title to North Carolina real property, however, must be resolved in accordance with the law of that jurisdiction. *See* 16 Am.Jur.2d *Conflict of Laws* § 27–29 (1979).

■ As one of his primary defenses for not consummating the contract, Cox asserts that title to the North Carolina realty was unmerchantable because of prior peat and mineral reservations and the lack of § 404 permits. In any contract to convey land, unless otherwise agreed, the law implies a duty on the vendor to convey a marketable title to the purchaser. *E.g., Townsend v. Stick*, 158 F.2d 142 (4 Cir. 1946) (applying North Carolina law); *Jones v. Hickson*, 204 Miss. 373, 37 So.2d 625 (1948). A marketable title is one which is "free from reasonable doubt in law or fact as to its validity" and "must be one which can be sold to a reasonable purchaser or mortgaged to a person of reasonable prudence." *Burkhead v. Farlow*, 266 N.C. 595, 146 S.E.2d 802 (1966). Therefore, prior mineral reservations render title to property unmerchantable. *Mincy v. Foster*, 125 N.C. 541, 34 S.E. 644 (1899); 77 Am Jur.2d, *Vendor and Purchaser* § 163 (1975). Nonetheless, in the case sub judice, Cox was aware of all outstanding peat and mineral reservations and expressly contracted to receive merchantable title to the property *subject to these reservations*. Therefore, he contractually modified his right to a merchantable title free of these encumbrances by agreeing otherwise. *See Townsend, supra; Jones, supra.*

■ Although Cox consented to accept the North Carolina land subject to designated peat and mineral reservations, he did not specifically contract to buy the property subject to governmental regulations restricting the construction of ditches. When the contract was signed, plaintiffs knew that Cox intended to clear and ditch the land, but neither they, Cox, nor their agents were aware that federal regulations prohibited such ditching without first obtaining § 404 permits. Cox urges that this governmental restriction on use renders title unmarketable and relieves him of any contractual obligation. North Carolina law, however, provides otherwise. When neither party is aware of a fact that would influence a contract between them; each party had equal and adequate means of discovering this fact; and the parties acted in good faith, courts will neither interfere with the contract nor grant relief on the basis of mutual mistakes. *Crowder v. Langdon*, 38 N.C. 476, 486 (1845).

The policy of the law is to administer relief to the vigilant, and to put all parties to the exercise of a proper diligence. In like manner, where the fact is equally unknown to both parties, or where each has equal and adequate means of information, or when the fact is doubtful from its own nature, in any such case, if the parties acted with entire good faith, a court of equity will not interpose . . . . Where each party is equally correct and there is no concealment of facts, mistake, or ignorance is no foundation for equitable interference.

*Crowder, supra*, at 486. The foregoing rule has been extended to contracts for the sale of land having governmental restrictions upon its use. *Fritts v. Gerukos*, 273 N.C. 116, 159 S.E.2d 536 (1968).

A restriction upon the use which may be made of land, or upon its transfer, which is imposed by a statute or ordinance enacted pursuant to the police power, such as a zoning ordinance or an ordinance regulating the size of lots, fixing building lines or otherwise regulating the subdivision of an area into lots, is not an encumbrance upon the land within the meaning of a covenant against encumbrances or a contract or option to convey the land free from encumbrances, being distinguishable in this respect from restrictions imposed by a covenant in a deed.

*Fritts, supra* 159 S.E.2d at 539; *see* Annot. 39 A.L.R.3rd 362, 370 (1971). We apply this principle here, and hold that the lack of § 404 permits for ditching the land does not render title unmerchantable. Nor does Cox's ignorance that federal law restricted use of the land without § 404 permits constitute a ground for relief, since this was a mistake of law, not of fact, unaccompanied by any representations of plaintiffs or their agents which led him to act under a mistaken belief of law. *Barnett v. Getty Oil Co.*, 266 So.2d 581 (Miss.1972); *Marriott Financial Services, Inc. v. Capitol Funds*, 23 N.C.

App. 377, 209 S.E.2d 423 (N.C.App.1974). Although Cox did not raise mistake as an affirmative defense in his answer or as a contested issue in the pretrial order, we nevertheless hold that Cox is not entitled to rescission on the ground of mistake.

 Cox's defense based upon false representation must necessarily fail under the facts found by the court from substantial evidence in the case, and therefore his affirmative defense and counterclaim based upon fraud are rejected. Cox also relies on his right to void the contract under ¶ 11 of the contract. This contingency clause allowed Cox to approve the land before being bound to purchase it. Furthermore, the clause provided that it was effective "[a]nything herein to the contrary notwithstanding." Since Cox never approved the land, he urges that the contract is not binding. To accept this argument, however, would compel us to ignore ¶ 9 which required Cox to exercise his contingency in writing by June 1, 1979. Contracts must be construed as a whole and effect given to all provisions unless such construction produces an unfair and unreasonable result. *E.g., Glantz Contracting Co. v. General Electric Co.*, 379 So.2d 912 (Miss.1980). The words "anything herein to the contrary notwithstanding" are construed to vest in Cox, as buyer, the absolute right to be satisfied with the property before being bound by the agreement. This right, however, was not of indefinite duration and had to be exercised within the prescribed time limit. Otherwise, Cox would have had an open-ended option to terminate the contract for any reason he might have assigned at any time. If ¶ 9 were not intended to limit the exercise of ¶ 11, its inclusion in the contract would be meaningless, a result clearly not intended. Despite the fact that ¶ 9 refers to "contingencies set forth hereinafter in Paragraph Nine (9)," this is a patent error and of no consequence since it plainly intended to refer to ¶ 11, the only paragraph relating to contingencies. *See Robinson v. Martel Enterprises, Inc.*, 337 So.2d 698 (Miss.1976). Furthermore, Cox's actions demonstrated his recognition of the June 1 deadline by acquiescing in Brick's request for a 10-day extension to resolve the peat dispute. Though Cox contends Brick was not acting as his attorney and therefore Brick's actions are not binding upon him, he made no effort whatsoever to disclaim Brick's acknowledgement of the deadline to seek contract modification. Having clothed Brick with apparent authority to act in his behalf and not asserting a contrary position, Cox is now estopped to disavow Brick's authority. *Steen v. Andrews*, 223 Miss. 694, 78 So.2d 881 (1955).

 Cox next urges that the deadline specified in the contract was unreasonable because the survey which he deemed necessary for approval of the land could not be performed by June 1 as specified in ¶ 13. There is no proof, however, that the survey could not have been completed by this date. Moreover, since Cox delayed authorizing the survey until late June for no apparent reason, he may not complain that the deadline as agreed upon denied him the opportunity to approve the property. The contract also called for a June 15 closing date, which could not have been accomplished without compliance with the June 1 deadline. Consequently, the date of the deadline was important and, since not demonstrated to be unreasonable, is enforceable. Plaintiffs did grant Cox a 10-day extension of the contingency deadline for resolving the peat dispute, but since Cox failed to timely object, he must be deemed to have waived all contingency rights by his silence for at least two months thereafter. *See Stinson v. Barksdale*, 245 So.2d 595 (Miss.1971). Although plaintiffs' contract did not expressly state that time was of the essence, nevertheless it is manifest that time considerations were of paramount importance, for John Hancock insisted to plaintiffs that there be prompt closing, and plaintiffs were in position to grant Cox only such extensions as were agreeable to John Hancock. Throughout, the parties acted in full recognition of the importance of time. We therefore hold that Cox's prompt performance as buyer was essential.

Another issue for us to decide is the effect of plaintiffs' failure to borrow $500,000

against the DeSoto County land for Cox's use as a down payment. This question is not free of difficulty. Paragraph 12 provided that if the loan were not made, "the contract will become null and void, and both parties shall be held harmless." It is, of course, familiar law that a contract which is void is a nullity and no contract at all, whereas a voidable contract is valid and binding until it is avoided by the person entitled to avoid it. See 17 Am.Jur.2d, *Contracts* § 7 at 342 (1964).

Although neither Mississippi nor North Carolina appears to have precisely decided the point, courts have generally held that the words "null and void" in a land sales contract are deemed to mean voidable at the election of the nondefaulting party. E.g., *Burns Mortgage Co. v. Schwartz*, 72 F.2d 991, 992 (3 Cir. 1934); *Jones v. Hert*, 192 Ala. 111, 68 So. 259, 260 (1915); *Metropolitan Life Ins. Co. v. Hall*, 191 Ga. 294, 12 S.E.2d 53, 61 (1940); *Marshall v. Porter*, 73 W.Va. 258, 80 S.E. 350 (1913). We believe that this salutary rule of construction should here apply.

Paragraph 12 provided both parties a means of release from the contract. If it were impossible for plaintiffs to borrow $500,000 against the DeSoto County land, they could terminate the agreement without being liable to Cox. However, if plaintiffs could borrow the money yet failed to do so, Cox could terminate the deal without liability to plaintiffs. Thus, each party was protected, though precluded from taking advantage of his own default. When plaintiffs informed Cox in July that they would not borrow the money, Cox had the option of declaring the transaction at an end. He did not do so. Rather, Cox informed plaintiffs that he would endeavor to raise necessary funds by other means; and the undisputed evidence is that he pursued that line, expecting to obtain the money from potential purchasers of portions of the North Carolina land. Cox took various steps such as placing documents in escrow, seeking closing extensions, authorizing dates for closing and making further land inspections. These actions, taken as a whole, unmistakably show that Cox regarded his contract with plaintiffs as viable, and are inconsistent with a claim of forfeiture. Furthermore, Cox never relied on plaintiffs' failure to put up the down payment as a ground for avoiding the contract. Indeed, this reason was never assigned until after suit was filed, and is asserted as an afterthought to justify his refusal to honor a contract when he realized how favorable the transaction was to plaintiffs.

Such conduct, we find, amounts to an implied waiver of Cox's right to avoid the contract without first specifically informing plaintiffs that he expected them to borrow and advance the down payment or else he would forfeit the contract. The Mississippi Supreme Court, in analogous situations, has consistently applied principles of waiver of contractual rights. *Newton Investment Co., Inc. v. Barnard and Burk, Inc.*, 220 So.2d 822, 824 (Miss.1969); *Tower Underwriters, Inc. v. Culley*, 211 Miss. 788, 53 So.2d 94, 96–97 (1951). In *Tower*, the courts specifically approved the general rule found in 17 C.J.S. Contracts § 409, pp. 897–8:

> Provisions for forfeiture may be waived by the person entitled to enforce them, either expressly or by implication, and the courts as a rule are quick to take advantage of circumstances indicating such an intention, although a waiver cannot be inferred from mere silence. Any inconsistent acts or dealings will be regarded as a waiver, but it has been held also that the intent to waive the forfeiture must be clear and unequivocal. Knowledge of the ground for forfeiture is of course essential to the waiver. A waiver once made cannot be recalled. Hence, after a party has acquiesced in a breach of the contract, he cannot thereafter urge a forfeiture because of such breach, unless he has given reasonable notice of an intention thereafter to enforce the contract according to its terms.

*Tower, supra*, 53 So.2d at 96–97. *See* 17 Am.Jur.2d, Contracts § 447, pp. 908–09 (1964). Also, North Carolina recognizes that a party by subsequent conduct may

waive his rights under a written contract. *Whitehurst v. FCX Fruit & Vegetable Service*, 224 N.C. 628, 32 S.E.2d 34 (1944). After Cox learned that he was unable to raise funds by reselling portions of the North Carolina land, he endeavored to complete the contract, first by seeking § 404 drainage permits and then by attempting to substitute other land. At no point in their dealings did he notify plaintiffs that he would end the transaction unless they provided the down payment pursuant to ¶ 12. Plaintiffs, had they been so informed, would have been entitled to a reasonable time to either borrow the money against the DeSoto County land or raise it by some other means. Having once acquiesced in a breach and never informing plaintiffs that they had to provide the down payment, Cox may not now assert as a defense plaintiffs' noncompliance with ¶ 12.

■ Finding that Cox is liable for breach of contract, we must determine damages allowable to plaintiffs. Plaintiffs contend that they should recover $2 million, since that was the agreed trading value of the DeSoto County land, which represented their profit on the transaction. Cox urges that the damages should be limited to $5,000 paid as earnest money by plaintiffs to John Hancock. We reject both contentions. Generally, damages awarded to a vendor of land for a purchaser's breach are the difference between the contract price and the market value of the land to be sold. 77 Am.Jur.2d Vendor and Purchaser § 489, p. 14–16 (1975). This formula applies only when the vendor is the owner of land to be sold and it fully compensates him for the loss of the bargain. Where the vendor does not own the property which he contracts to sell, his loss is based on profit, if any, he would have realized from resale at the contract price. *Id.* Mississippi recognizes that profits which would have been realized had the contract been performed may be recovered as damages for its breach provided they are susceptible of being ascertained with reasonable certainty. *McDaniel Bros. Const. Co. v. Jordy*, 195 So.2d 922 (Miss. 1967); *U. S. Finance Co. v. Barber*, 247 Miss. 800, 157 So.2d 394, 398 (1963). Allow-ance of profit, where shown with reasonable certainty, achieves the purpose of restoring the injured party to the financial position he would have enjoyed had there been no breach. *See Mid-Continent Tel. Corp. v. Home Tel. Co.*, 319 F.Supp. 1176 (N.D.Miss.1970).

■ In this case the profit to be derived by plaintiffs is not speculative but readily ascertainable. Their loss is the difference between the amount they were to pay John Hancock ($4,881,593.82, calculated at $390.59 per acre for 12,498 acres) and what Cox agreed to pay them, i.e., the same sum plus the DeSoto County land. Since they are not receiving the land, plaintiffs are entitled to recover damages based upon its fair market value, as it clearly represents their profit. Plaintiffs having presented very little evidence of fair value, we find as a fact that the best evidence of the market value of the DeSoto County land, comprising 250 acres, is Cox's cost of $1,425,000. Cox acquired the tract in 1974, and there is no evidence that its market value has declined. Since this figure represents the fair value of 250 acres, rather than 216 net acres that plaintiffs expected to receive in the exchange (see note 3, *supra*), it is necessary to deduct from the tract the 34 acre parcel required to be deeded to a third party. A reasonable estimation of profit, under credible evidence, is to arrive at a per acre value for the entire 250 acres, or $5,700 per acre. We thus determine market value of the remaining 216 acres to be $1,231,200 (216 × $5,700) as profit due plaintiffs for breach of contract.

No award of punitive damages is proper, however, since Cox's breach was not occasioned by such malicious or willful conduct as to amount to an independent tort. *Goldberg v. Lowe*, 509 F.Supp. 412, 423 (N.D. Miss.1981). Neither do we think it is appropriate to award plaintiffs prejudgment interest since Cox's contest of plaintiff's claim was not frivolous but conducted in good faith. *Glantz Contracting Co. v. General Electric Co.*, 379 So.2d 912, 918 (Miss. 1980).

Let an order enter awarding to plaintiffs the compensatory damages herein computed and dismissing defendant's counterclaim with prejudice.