# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CP-00823-COA

## CONSOLIDATED WITH

## NO. 2018-CT-00544-COA

**WILLIAM T. WHITE D/B/A ROYER ESTATES INC.**                    **APPELLANT**

**v.**

**PATSY B. WHITE**                                                **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/22/2022 |
| TRIAL JUDGE: | HON. RHEA HUDSON SHELDON |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM T. WHITE (PRO SE) |
| ATTORNEY FOR APPELLEE: | PAUL E. ROGERS |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; AND REMANDED - 03/12/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND SMITH, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     William T. White[1] appeals from the Pike County Chancery Court's final judgment imposing a constructive trust and ordering William to transfer to his mother, Patsy White, a parcel of property owned by William T. White d/b/a Royer Estates Inc. (William). He argues that the trial court erred in finding that William waived his right to assert the affirmative defenses of unclean hands and accord and satisfaction by failing to answer Patsy White's

---

[1] William's middle name is Timothy. In several documents and in testimony at trial, he is often referred to as "Tim."

second amended complaint in the time required by the Mississippi Rules of Civil Procedure. He also argues that the trial court erred by finding that a confidential relationship existed between him and Patsy, by finding that the voluntary-payment rule did not apply, by considering William White to be an alter ego of Royer Estates Inc., and by refusing to join the estate of Larrye White.

## FACTS AND PROCEDURAL HISTORY

¶2.     This action involves twenty-two acres of land located in Pike County, Mississippi. To understand the scope of the present lawsuit, we must go back to 1985 when William's parents Larrye and Patsy White founded the business Royer Homes, a manufactured home retailer.   Eventually, Royer Homes expanded to include eight regional sales centers throughout southern Mississippi.  William began working for his parents before college. After college, he returned to work with them and was promoted to regional sales manager for the McComb area.  In July 2002, Larrye told William that it was "time for [William] to buy" the sales centers that William was managing.  William agreed and created Royer Estates, through which he purchased the sales centers under an owner-financing agreement with his parents.  As part of the agreement, Larrye and Patsy allowed William to use their lines of credit to purchase inventory.

¶3.     Between 2002 and 2004, William started various other businesses.  He obtained a realtor's license and created White Sands Realty to provide mortgage financing.  William also created White Haul Transport, a trucking company.

¶4.     Two years after William established Royer Estates, Larrye and Patsy lost their lines

2

of credit from multiple creditors. At this time, William was still relying on the line of credit for floorplan financing from his parents for some of his businesses.

¶5. In January 2005, William, through Royer Estates, purchased roughly fifteen acres from Pauline Edwards to create a manufactured home development. The agreement also granted William an option to purchase the remaining twenty-two acres for a set price. If William exercised the option, Edwards agreed to owner-finance the purchase. After William obtained the fifteen acres from Edwards, Larrye requested that William take several of Larrye and Patsy's unsold manufactured homes and put them on William's property to sell. William paid to move three of these mobile homes onto the fifteen acres.[2]

¶6. Later, in August 2005, Hurricane Katrina hit the Gulf Coast. During the recovery, White Haul Transport obtained a sub-contract to manage debris removal for three months in Louisiana. Larrye and Patsy assisted White Haul Transport in this endeavor. However, after doing the work, White Haul Transport was not paid, which forced William to file suit in federal court in Louisiana in mid-2006. This was referred to as the "Coastal Bridge Litigation."

¶7. Also in 2005, William attempted to exercise his option to purchase the remaining twenty-two acres of land from Edwards. However, Edwards refused, and William filed a lawsuit to enforce the option. Ultimately William succeeded in 2007, and the court required

---

[2] In 2004, one of the creditors supplying floorplan financing to Larrye and Patsy, Bombardier Capital, sued them (Larrye and Patsy). Bombardier Capital later obtained a judgment for nearly $800,000 against them. Larrye and Patsy's act of transferring the homes to William would later be the subject of litigation between Bombardier and Larrye and Patsy to determine if the transfer was an attempt to hide assets.

Edwards to deed the land to William and owner-finance it as agreed. Through this owner-financing agreement, William would pay Edwards $882 per month until the $56,375 mortgage was satisfied.

¶8.    During the course of the Coastal Bridge litigation, in May 2008, Larrye, Patsy, and William met at an RV park and entered into an oral agreement, the terms of which according to William included: (1) Larrye and Patsy would pay all of the costs and legal fees of the litigation, as well as cover all of William's personal and business loans;[3] (2) William would actively pursue the litigation;[4] (3) if the outcome was favorable to White Haul Transport, Larrye and Patsy would be reimbursed for the legal fees they actually paid; (4) any additional money received would be shared among the three of them; (5) William would reimburse Patsy and Larrye any money they paid his creditors during the litigation out of his share; (6) if the litigation was not favorable, they would also share equally in the losses; (7) if William still owed Patsy and Larrye any money after the settlement, they would come to an amicable and mutual agreement on how to pay any remainder. William prepared a document dated March 12, 2009, that he alleged memorialized this agreement. However, this document was only signed by William.

¶9.    The existence of the parties' agreement was supported by and reflected in an email

---

[3] This would include debts to William's personal attorney Edward Bean in a custody battle, which will become relevant later.

[4] William testified that the work he performed to bring the Coastal Bridge litigation to a beneficial conclusion entailed roughly 3,000 hours of work and consisted of itemizing tens of thousands of invoices for various subcontractors that were used during the work with Coastal Bridge.

4

that Patsy sent to her attorney at the time, in which Patsy said:

> We want a legal signed agreement by all parties to the following terms if any monies are received from Coastal and RCS:
>
>> 1. All legal fees and costs will be reimbursed directly to Larrye and Patsy White.
>> 2. The balance will be made payable to White Haul Patsy White [sic] who will deposit monies in a savings account.
>> 3. Patsy White agrees to audit the ledger, all accounts receivable, all payables, all monies paid to parties and on behalf of any party involved in this contract agreement to determine amount owed to each member of venture.
>> 4. Patsy White agrees to supply said audit material to each member of venture for review and consent.
>> 5. If members of group fail to agree on dis[b]ursement or audit, we all agree to a certified arbitrator for arbitration and cost will be shared equally.

At trial, Patsy agreed that there was an oral agreement in 2008 and that she had agreed to pay

William's personal debts:

> [Counsel for William]: . . . You started paying directly on the property for this 22 acres in June of 2008, correct?
>
> [Patsy]: Yes.
>
> Q: And your testimony also said that you had paid Tim some money prior to that to pay towards this debt; is that correct?
>
> A: Yes.
>
> . . . .
>
> Q: Was it your understanding in the middle of 2008, that Tim would pay you back for the payments you made on his behalf?
>
> A: It was our understanding that he was supposed to reimburse us for monies.
>
> Q: And it wasn't until December of 2008, then that you demanded that he convey the properties to you, correct?

5

A: I don't remember the exact timeline. I know that it was after the disagreement with his dad. I don't know if that email right there is the first on or not.

. . . .

Q: In the top email it says December of 2008; is that correct?

A: Yes.

Q: *So you had been paying Tim's debts for at least six months before you demanded that he convey these properties; is that correct?*

A: *I would think we were paying them before that.*

(Emphasis added).

¶10.    While working on the Coastal Bridge litigation, William's personal and financial life deteriorated. His wife filed for divorce and custody of their son, requiring him to retain an attorney (Bean). Despite their agreement, Patsy failed to pay William's divorce lawyer or his mortgage. William's home was eventually lost through foreclosure. As William would later testify, he was now in a very precarious situation, and relied almost entirely on the agreement that his parents would pay his bills while he completed work on the Coastal Bridge litigation.

¶11.    In the fall of 2008, Patsy failed to pay the Coastal Bridge attorneys, causing significant delay in the Coastal Bridge litigation concluding. In December 2008, Patsy demanded that William transfer to her and Larrye all of the property that William owned that she was paying for, including the subject twenty-two acres. The reasons for such a transfer were several. Based on emails between William and Patsy, Patsy wanted all of William's properties as collateral for their payments of William's debts. Patsy also stated in an email to William that

6

this would prevent Bean from being able to put a lien on the properties.[5] William alleged that Patsy unilaterally demanded the property transfer, knowing that he could not refuse due to his precarious financial condition, due in part to her failure to pay his bills as they had agreed. William alleged that he only agreed to transfer the properties under "protest, duress, undue influence, coercion" and not of his own free will. William transferred five of the properties he owned to Patsy, but, as Patsy would later discover, William did not transfer the subject twenty-two acres.[6]

¶12. William testified regarding emails he sent to Patsy, offering her an assumption warranty deed for the property. However, according to William, Patsy refused to accept the assumption warranty deed but would not tell him what she wanted in its place. William claimed that this was, at least in part, why he never transferred the property to her.

¶13. In March 2009, William signed an agreement allowing Patsy to receive and disburse any proceeds from the Coastal Bridge litigation. In March 2010, Larrye passed away due to colon cancer. In April 2010, William settled the Coastal Bridge litigation, and in May 2010, William gave a check for $528,145, the net proceeds of the litigation, to Patsy. Based on Patsy's calculations, William was owed roughly $100,000. However, she kept this amount

---

[5] William owed Bean $25,000 in attorney's fees, and at this time Bean had threatened to sue.

[6] The following properties were transferred into Patsy's name: five acres in Brookhaven William appraised at $37,500 after deductions; sixteen acres at a subdivision appraised at $96,000; four acres in Meridian estimated at $8,000–$12,000; three manufactured homes (assumed to be on the fifteen acres William originally purchased from Edwards) which brought in $975/month valued at $70,000. This last property was actually broken up into two parcels.

as "reimbursement" for the debts that she had paid while William pursued the litigation.

¶14.    Between 2011 and 2016, Patsy paid the property taxes on the twenty-two-acre property, as well as the other properties William had transferred to her. In 2010, Patsy requested that the tax notices be sent directly to her. On the notices for these taxes, Royer Estates was still listed as the owner of the subject twenty-two acres. Patsy did not ask William about this matter, nor did she seek any clarification as to whom the property was titled.

¶15.    Meanwhile, Bean sued not only William for the unpaid attorney's fees, Bean also included Patsy and Larrye as defendants in the litigation, alleging they hid assets. On January 16, 2012, the Chancery Court of Pike County decided that the transfer of almost all William's property to his parents was in fact an attempt to defraud Bean.[7] The court specifically stated that "there was no evidence to establish a legal obligation by William Timothy White [to] Patsy and Larrye White." Based on this, the court found that William's transfer of all of this property was fraudulent.

¶16.    Patsy completed paying $59,387 on the mortgage in November 2013. In March of 2014, when Patsy began the process of selling the subject property, she realized that the title was never transferred to her and was still in the name of Royer Estates. After speaking with William about this, William refused to transfer the property because he considered the Coastal Bridge litigation funds had made her whole.

*Litigation Leading Up to First Appeal*

---

[7] The case is *Edwin L. Bean v. William Timothy White et al.* in the Chancery Court of Pike County, Mississippi (Cause No. 2009-664).

¶17.   On July 21, 2014, Patsy filed a complaint in the Pike County Chancery Court to quiet title, obtain injunctive relief, and sue for damages against William T White d/b/a Royer Estates Inc. based on William's breach of the agreement to transfer the property to her in exchange for her continuing to pay the mortgage.  On August 27, 2014, Patsy filed an amended complaint, further alleging that William was interfering with Patsy's attempt to sell the other properties that he actually did transfer to her.  On September 24, 2014, William filed an answer to Patsy's amended complaint.  In this answer, William raised the following affirmative defenses: (1) duress/coercion; (2) wrongful/unjust enrichment; (3) accord and satisfaction; (4) voluntary payment; (5) unclean hands; (6) arbitration; (7) breach of contract; (8) alter ego; (9) estoppel; and (10) statute of frauds.  William also filed a motion to dismiss, arguing that Patsy demanded William convey the properties in an effort to hide assets,[8] despite William's protests to such a conveyance.  He also argued that Patsy's payment of the mortgage on the subject property was voluntary, was paid "to keep him from losing everything he owned," and that Patsy received the $528,145 from the Coastal Bridge litigation, thus absolving William of any debt to Patsy for the payment of the mortgage. William also argued that this matter should be referred to arbitration based on the disbursement agreement signed only by William and the email from Patsy in which she demanded the agreement be drafted.  Patsy filed a response to William's motion on March 24, 2016, denying the allegations.

---

[8] In doing so, William pointed to the previous 2012 judgment in the Edward Bean litigation, which found that the transfers were in fact a fraudulent attempt to hide assets from William's personal attorney Bean.

¶18.   On April 22, 2016, Patsy filed a second amended complaint which included a constructive trust claim.  William filed a motion to dismiss the second amended complaint, arguing that the breach of contract claim was barred by the statute of frauds and that the constructive trust claim failed based on Patsy's failure to set forth factual allegations of each material element necessary to prove a constructive trust.  However, William did not file an answer to the second amended complaint at that time.  On July 17, 2017, the trial court granted William's motion to dismiss the second amended complaint.  Patsy filed for reconsideration, and the court entered its order and findings of fact and conclusions of law denying the motion for reconsideration.  Patsy filed a notice of appeal.

*First Appeal*[9]

¶19.   In her appeal, Patsy argued that

> (1) her claim does not violate the Statute of Frauds; (2) her claim is not barred by the statute of limitations; (3) the chancery court wrongly dismissed her request for mandatory injunctive relief; (4) the chancery court wrongly denied the imposition of a constructive trust; and (5) the chancery court failed to grant her a lien against the subject property.

*White v. White*, 325 So. 3d 666, 670 (¶11) (Miss. Ct. App. 2020).  In reviewing Patsy's arguments, this Court found that the statute of frauds expressly barred Patsy's claim because there was no written agreement that memorialized the alleged agreement by her and William for him to transfer the land to her.  *Id*. at 671 (¶13).  However, we also found that the constructive trust claim was still available.  *Id*. at (¶19).  Specifically, we held that, although Patsy's factual allegations may have been in dispute at the time, they were required to be

---

[9] On February 27, 2023, the Mississippi Supreme Court ordered the consolidation of the first appeal's record with the current record on appeal.

taken as true at the time that the motion to dismiss was filed. *Id*. at 673 (¶28). Taking the allegations of the second amended complaint as true, the trial court should have denied the motion to dismiss as it pertained to the constructive trust claim. *Id*. at 674 (¶33). Further, we held that since Patsy made a claim of constructive trust, the ten-year statutory limitations period for constructive trust claims applied, and the period had not started to run until Patsy discovered that the property was not transferred to her by William. *Id*. at 676 (¶41). Thus, the statute-of-limitations defense also did not act as grounds for dismissal. *Id*. at (¶42). Based on this reasoning, we remanded the case for further proceedings only as it relates to Patsy's constructive trust claim. *Id*. at 677 (¶44).

*Proceedings Following First Appeal*

¶20. On September 10, 2020, the trial court entered a scheduling order. At that point, William had not filed an answer to the second amended complaint. Neither the scheduling order nor the transcript of the scheduling conference mentioned the lack of an answer to the second amended complaint that was the focus of the first appeal.

¶21. The parties proceeded to engage in discovery. On October 3, 2020, William, acting pro se, filed requests for admissions, asking that Patsy admit or deny 101 individual items. Many of the requests related to matters regarding the Coastal Bridge litigation, the Edward Bean litigation, and the assignment of rights by William to Patsy. William also moved for discovery, requesting Patsy produce her bank statements to show how much money she received from him and how much she used to pay the debts on the property. On October 8, 2020, Patsy filed a motion in limine and requested a protective order. In the request for a

11

protective order, Patsy asked that she not be required to answer any request for admissions or produce any materials, like the bank statements, relating to claims other than constructive trust. In the motion in limine, she requested that William be prevented from presenting any evidence or eliciting testimony at trial regarding claims or matters no longer before this court (i.e., the contract claims).

¶22. On January 26, 2021, William responded to Patsy's motion in limine and protective order, and a motion to compel discovery. William argued that the requests for admissions were neither ambiguous nor unreasonable and that all the admissions requested were meant to help the trial court determine whether or not Patsy was entitled to a constructive trust.

¶23. At the hearing on Patsy's motion, the court and the parties acknowledged that the sole cause of action remaining was whether Patsy was entitled to a constructive trust on the property. William repeatedly pointed out that he needed information through discovery to establish that she was not entitled to a constructive trust because of the payments she had received. William argued the following:

> Yes, I agree the Court of Appeals has kind of narrowed the focus, but that doesn't change my defense, and the information of production, and information I need in order to properly defend their accusation that Mrs. White is entitled to a constructive trust against property that, in my opinion, she paid for with money that I gave her, so how I can owe her still is beyond my imagination.
>
> . . . .
>
> I'm trying to clear up her answers because her answers are all over the place. One minute I owe her a million dollars. One minute I owe her $500,000. One minute I owe her $2 million. I'm trying to clear that up for this Court to make it simple. And asking for support of her numbers[.]

William also raised his unclean-hands defense and pointed to her breach of their agreement.

¶24. The court limited the allegations and discovery Patsy had to answer and produce regarding only the constructive trust. The court did state, however, that whether there was any unjust enrichment or money owed would need to be determined. William specifically asked:

> Mr. White: And, your honor, I – and so do I have the right to show funds that have been given to her from various transactions that was part of her total business that should have offset that amount?
>
> The Court: You will be able to show in your defense payments or funds that you would have transferred or provided to Mrs. White.

At this point, although the court limited discovery, there was no ruling limiting William's ability to proceed with the defenses he had raised in his original answer.

¶25. William filed a motion for summary judgment in April 2021 in which he argued how the affirmative defenses that he raised in his first answer applied to Patsy's claim for a constructive trust. On May 18, 2021, the trial court denied William's motion, stating that there remained "genuine issues of material fact."

¶26. Trial was set to begin on December 16, 2021. However, on the day of the trial, Patsy made an ore tenus motion to direct entry of default for William's failure to file an answer to the second amended complaint. The trial court continued the case and gave the parties time to file written motions and responses on the issue.

¶27. On December 17, 2021, Patsy filed a written "motion in limine and for the court to direct entry of default" for William's failure to file an answer to the second amended complaint. In this motion, Patsy pointed out that following her filing the second amended

13

complaint, William only filed a motion to dismiss and did not file an answer. After the case was appealed and remanded to the trial court for further proceedings on the constructive trust claim, Patsy argued that William was required to file an answer to the second amended complaint pursuant to Mississippi Rule of Civil Procedure 12(b). Because he did not, Patsy argued, all the allegations made in the second amended complaint should be deemed admitted. Further, because now no factual issues were in dispute because of the claims that should be deemed admitted, Patsy argued that the court should direct the clerk to enter a default and ultimately enter a default judgment in her favor.

¶28. On December 21, 2021, William filed a response in opposition to the motion in limine and a motion requesting leave to file an answer to Patsy's second amended complaint. William attached a draft of his proposed answer to his motion. In the draft answer to the second amended complaint, William raised many of the same affirmative defenses he had raised in his original answer: (1) failure to state a claim upon which relief can be granted; (2) statute of limitations; (3) estoppel; (4) payment, release, and accord and satisfaction; (5) voluntary payment; and (6) unclean hands.

¶29. After a Zoom hearing on January 7, 2022, the court entered an order granting in part and denying in part Patsy's motion in limine and request for an entry of default. The court denied the request for entry of default but allowed William to file his answer and include any affirmative defenses to the second amended complaint. However, the court would not allow or consider any testimony or evidence relating to William's affirmative defenses at trial because the court considered those defenses waived by the failure to have timely filed the

answer.

¶30. On January 24, 2022, William filed his answer to the second amended complaint and a motion for reconsideration. In it, William argued that he is, in particular, asserting three affirmative defenses: (1) unclean hands, by virtue of Patsy requiring William convey the properties under threat of reneging on their prior agreement; (2) voluntary payment, based on Patsy's continued payments on the property without confirming whether the property was actually conveyed to her; and (3) accord and satisfaction, because Patsy had already received consideration for her payment of the mortgage on the property in the form of the settlement proceeds from the Coastal Bridge litigation. William argued that he had raised these defenses in his original answer to the first amended complaint, in his motion to dismiss the second amended complaint, and in his motion for summary judgment. Based on these pleadings, William argued that Patsy would not be prejudiced by the court allowing William to present evidence of the unclean hands, voluntary payment, and accord and satisfaction affirmative defenses.

¶31. On February 22, 2022, the court denied in part and granted in part William's motion for reconsideration. The court found that William did raise the affirmative defense of voluntary payment in his motion to dismiss the second amended complaint and that the timely filed motion constituted a responsive pleading. Based on these findings, the court concluded that the voluntary payment affirmative defense had not been waived. Thus, William would only be allowed to present evidence of the voluntary payment affirmative defense at trial. However, William would still not be able to present any evidence of unclean

15

hands or accord and satisfaction because the Court reasoned that those defenses were waived for failing to file a timely responsive pleading to the second amended complaint.

*Trial*

¶32. William admitted at trial that he agreed to transfer the property to Patsy, but only under duress. He also said he later changed his mind because he had paid her with his proceeds from the Coastal Bridge litigation funds. He admitted that he never told Patsy that he did not, and was no longer intending to, transfer the property into her name. William also admitted that he had only paid one year of *ad valorem* taxes on the subject property, but he could not present any evidence that he had actually paid that year's taxes. William testified that he had worked closely with both Patsy and Larrye throughout his career and that up until late 2008, he had a long-term, close relationship with his parents. William argued that, based on the first agreement among him, Larrye, and Patsy, the payments they made on the note were voluntary, and thus Patsy did not have any claim to the property.

¶33. Throughout the proceedings, William attempted to testify about facts relevant to the unclean hands and accord and satisfaction defenses. When asked about his failure to pay Edwards's property mortgage and who made payments, the following exchange occurred:

> Q: Tell me the date on or about that you ceased making payments, Mr. White, on [the subject property]?
>
> A: Last one that came out of my checking account was in May of '08 – out of Royer Estate's checking account. Let me clarify it.
>
> . . . .
>
> Q: You wrote no checks, made no direct payments after May of '08 on this note?

16

A: Not directly to Ms. Pauline Edwards, no.

Q: Somebody else made all those payments, correct?

A: With money that I gave her, yes. Excuse me. Money I trusted to her, yes.

¶34. When questioned about the alleged arrangement wherein William would manage the Coastal Bridge litigation and Patsy and Larrye would pay his debts, William admitted that the agreement was not in writing. However, he insisted that his parents had still agreed to do so. He also testified why he *did* deed the properties to his mother:

Q: Well, tell me why you – when and why did you deed properties to your mother?

A: Because she began withholding payments that they had previously agreed to pay. Let things go into foreclosure and bankruptcy. Quit paying the attorneys at Coastal Bridge. Got them about 120 days behind on their bill. About 40 grand. And then with my house in foreclosure, my truck had been repossessed. The Edwards property in foreclosure. My commercial property had gone into foreclosure. She demanded that I convey these properties to her before she would honor the original agreement and pay the notes.

Q: So at some point in time, there was you at the request of your mother, however, made you agreed to convey certain properties to her; did you not?

A: Only under duress and extreme –

Q: Whatever – I'm not asking about the circumstances.

¶35. At trial, Patsy introduced evidence in the form of checks and bank statements that showed that she had paid a total of $59,387 to Pauline Edwards for the subject property. Patsy produced tax receipts as evidence that she had paid the *ad valorem* taxes on the property the entire time she paid the note. However, the tax notices also reflected that the property was titled to Royer Estates, not Patsy White. She also testified and presented emails between herself and William that showed their agreement that she would pay the monthly

17

note on the property, but only if William transferred the property into her name. Patsy also presented evidence that the property was, and still is, in the name of Royer Estates, which she claimed was an alter ego of William.

¶36. After the plaintiff rested, William's counsel questioned William again. When asked to describe the arrangement he had with Patsy and Larrye regarding their payment of his debts, William again discussed the Coastal Bridge litigation and the May 8, 2008 meeting where Patsy, Larrye, and he had agreed that they would pay his debts while he worked on the litigation. When asked what representations he had made to his parents for them to take on his debts, William said that he never represented that he would transfer any of his properties to them. Rather, the only benefit they would gain from the arrangement was a share of the settlement of the Coastal Bridge litigation.

¶37. On cross-examination, Patsy's counsel asked William why he did not sue Patsy and Larrye when Patsy unilaterally changed the terms of the verbal agreement they had made in May of 2008. William responded, "Well, let's see. It's my mom and dad. My dad is dying of cancer. That's enough."

¶38. The trial court entered a final judgment on April 22, 2022, imposing a constructive trust on the subject property and requiring William to transfer the property to Patsy. In the judgment, the court found that William and Patsy had a confidential relationship based in part on their familial relationship but also because of their long history of business dealings. The court found that William abused this confidential relationship by refusing to transfer the property to Patsy in accordance with their agreement. The court further found that the

18

voluntary-payment rule did not apply because Patsy had refused to pay the note unless the property was transferred to her. Thus, the court found that Patsy had satisfied the elements of a constructive trust and ordered William to transfer the property to her. William filed a motion to alter or amend the judgment or for a new trial on May 2, 2022, and a supplemental motion on July 15, 2022, raising the issues he now raises on appeal. Patsy filed a response on May 5, 2022, and a supplemental response on July 18, 2022. The trial court denied the motion to alter or amend or for a new trial on August 1, 2022. William filed a notice of appeal on August 16, 2022.

*Current Appeal*

¶39.    On appeal, William raises the following issues: (1) whether the trial court erred in finding that William had waived his right to assert affirmative defenses by failing to answer in the time required by the rules; (2) whether the trial court erred in its finding of a confidential relationship between Patsy and William; (3) whether the trial court erred in its finding that the voluntary payment rule was negated when William failed to honor the original agreement between himself and Patsy to transfer the property to her; (4) whether the trial court erred in imposing a constructive trust; (5) whether the trial court erred in taking judicial notice that William White is an alter ego of Royer Estates; (6) whether the trial court abused its discretion in finding that Patsy had a possessory interest in the land; (7) and whether the trial court erred in not joining the estate of Larrye White to the present suit.[10]

**STANDARD OF REVIEW**

---

[10]    Although in his brief William raises nine issues, some are duplicative. For conciseness and clarity, we have consolidated some of these issues.

19

¶40.    Our Court reviews questions of law de novo. *Stinson v. Hall*, 938 So. 2d 887, 889 (¶4) (Miss. Ct. App. 2006). "The chancellor, as the trier of fact, evaluates the sufficiency of the proof based on the credibility of witnesses and the weight of their testimony." *Id.* We will not disturb a chancellor's findings of fact unless they were manifestly wrong, clearly erroneous, or the result of the chancellor applying the wrong legal standard. *Powell v. Meyer*, 203 So. 3d 648, 652 (¶16) (Miss. Ct. App. 2016). We review a trial court's decision of whether to admit or suppress evidence using an abuse-of-discretion standard. *Tunica County v. Matthews*, 926 So. 2d 209, 212 (¶5) (Miss. 2006).

## DISCUSSION

### 1.    Whether the trial court erred in finding William had waived his affirmative defenses by failing to timely file an answer.

¶41.    William argues that he did not waive his right to assert and prove his affirmative defenses by failing to timely file his answer to the second amended complaint for two reasons: (1) because he had already raised some affirmative defenses in his original answer; and (2) because he timely filed a motion to dismiss the second amended complaint in which he asserted the affirmative defenses.

¶42.    Affirmative defenses are generally waived if they are not raised in a party's original response to a complaint. In *Pruitt v. Sargent*, 349 So. 3d 729, 731 (¶5) (Miss. 2022), where the defendant failed to raise the statute of limitations affirmative defense in his original answer, the Mississippi Supreme Court cited Mississippi Rule of Civil Procedure 8(c) in its entirety, which reads:

> In pleading to a preceding pleading, a party shall set forth affirmatively accord

20

and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, *and any other matter constituting an avoidance or affirmative defense*. When a party has mistakenly designated a defense as a counter-claim or a counter-claim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been proper designation.

(Emphasis added). The Supreme Court held that it has "interpreted this rule to mean that, generally, if a party fails to raise an affirmative defense in its *original answer*, the defense will be deemed waived." *Pruitt*, 349 So. 3d 731 (¶5) (emphasis added) (quoting *Hutzel v. City of Jackson*, 33 So. 3d 1116, 1119 (¶12) (Miss. 2010)).

¶43. In the present case, William *did* assert various affirmative defenses in his original answer to Patsy's first amended complaint, including (1) duress/coercion, (2) wrongful/unjust enrichment, (3) accord and satisfaction, (4) voluntary payment, (5) unclean hands, (6) arbitration, (7) breach of contract, (8) alter ego, (9) estoppel, and (10) statute of frauds.[11] In the answer to the second amended complaint that the court allowed William to file, he raised the following affirmative defenses: (1) unclean hands, (2) voluntary payment, and (3) accord and satisfaction, (4) estoppel, (5) failure to state a claim upon which relief can be granted, and (6) statute of limitations.[12] Comparing the two answers it is clear that some of the affirmative defenses raised in the second answer were also raised in William's original

---

[11] William also continued to assert these defenses in his motion to dismiss and later in his motion for summary judgment.

[12] Because William's failure to state a claim and statute of limitations defenses with respect to a constructive trust were addressed in the previous appeal, we need not address those again. Instead, we will focus our analysis in this section on whether the court should have allowed proof on the unclean hands, accord and satisfaction, and estoppel defenses.

21

answer, satisfying Mississippi Rule of Civil Procedure 8(c). The question at bar, however, is whether William should be allowed to pursue the affirmative defenses raised in both his first and second answers.

¶44. First, we point out that the circuit court properly allowed William to file an answer in accordance with *Franklin Collection Service Inc. v. BancorpSouth Bank*, 275 So. 3d 1048, 1058 (¶41) (Miss. 2019). In *Franklin*, the debt-collection company Franklin Collection Service Inc. (Franklin) sued BancorpSouth, which managed Franklin's general operating account. *Id*. at 1051 (¶1). Franklin was demanding reimbursement of overdraft fees. *Id*. at 1052 (¶5). In Franklin's first amended complaint, Franklin alleged that BancorpSouth charged Franklin excessive overdraft fees and that these practices were neither fair nor adequately disclosed to Franklin. *Id*. It further argued that BancorpSouth artificially manipulated the order in which checks were charged in order to maximize overdraft fees. *Id*. In particular, Franklin claimed breach of contract and negligence. *Id*. BancorpSouth timely responded to the first amended complaint with an answer asserting forty-three affirmative defenses. *Id.*

¶45. Franklin later filed a second amended complaint, in which it dropped claims previously raised, and asserted a new claim for breach of fiduciary duty. *Id* at (¶6). BancorpSouth did not file an answer to the second amended complaint. *Id*. Nevertheless, the parties continued to actively pursue litigation for more than three years. *Id*. at (¶¶6-7). As trial neared, Franklin filed a motion to deem the allegations of the second amended complaint admitted because of BancorpSouth's failure to file an answer, and for the court to

22

enter default. *Id.* at (¶7). Default was entered by the clerk, and Franklin then moved for a default judgment. *Id.* BancorpSouth filed a motion to set aside the entry of default and moved for leave to file an answer to the second amended complaint. *Id.* at 1052-53 (¶8). Attached to this motion was BancorpSouth's answer and proposed affirmative defenses. *Id.* Following a hearing, the circuit court denied the motion for a default judgment, denied the motion to deem the allegations of the second amended complaint admitted, denied BancorpSouth's motion to set aside the entry of default, and granted BancorpSouth's motion for leave to file an answer to the second amended complaint. BancorpSouth then filed its answer to Franklin's second amended complaint, including its affirmative defenses. *Id.* at 1053 (¶9).

¶46.  Both parties filed interlocutory appeals. Franklin argued that the trial court erred in denying its motion to deem the allegations of the second amended complaint admitted. *Id.* at (¶10). In arguing that the trial court should have deemed the allegations of the second amended complaint admitted, Franklin pointed to Rules 8(d) and 55(a). *Id.* at (¶40).

¶47.  "Averments in a pleading to which a responsive pleading is required, other than those as to the amount of damages, are admitted when not denied in the responsive pleading." *Id.* at 1058 (¶41) (citing M.R.C.P. 8(d)). Based on this rule, Franklin argued that BancorpSouth's failure to answer the second amended complaint meant that every allegation of Franklin's second amended complaint was deemed admitted by operation of Rule 8(d). *Id.* However, the supreme court disagreed with Franklin's reading of the rule. Specifically, the supreme court stated:

23

> Franklin reads Rule 8(d) in isolation, without considering other procedural rules, including Mississippi Rule of Civil Procedure 55. Rule 55, which governs default, applies specifically to situations in which the defendant fails to answer. M.R.C.P. 55(a). Unlike Rule 8(d), Rule 55 affords relief to a party for its failure to answer. M.R.C.P. 55(c). Under Rule 55(c), the trial court has the discretion to set aside an entry of default. M.R.C.P. 55(c). If we read Rule 8(d) in the manner suggested by Franklin, Rule 55 would be meaningless. Based on Franklin's isolated read, even were an entry of default set aside under Rule 55(c), such action would serve no purpose, because, under Rule 8(d), the allegations of the second amended complaint would stand admitted. While this Court has not specifically addressed Franklin's position, other jurisdictions have and have determined that a party's failure to timely answer is best addressed by Rule 55.

*Id.* at (¶43). In light of this consideration of the Rules in their entirety, the supreme court found that the trial court did not abuse its discretion in allowing BancorpSouth to file an untimely answer to Franklin's second amended complaint. *Id.* at 1061 (¶58). However, the supreme court refrained from deciding whether Franklin should be allowed to present proof of the affirmative defenses raised in its answer, because the parties had not raised the issue in their appeals, and thus it was not properly before the court. *Id.* at (¶59).

¶48. *Franklin* is clear precedent that the chancery court correctly allowed William to file an answer to the second amended complaint. However, because *Franklin* did not determine if a party could present proof of affirmative defenses raised in such circumstances, we must engage in further analysis.[13]

---

[13] The *Franklin* court based much of its reasoning on the Eleventh Circuit case *Perez v. Wells Fargo N.A.*, 774 F.3d 1329 (11th Cir. 2014), which allowed a plaintiff to assert new causes of action late in the litigation. Perez had sued Wells Fargo in Georgia state court for wrongfully freezing her bank account. *Id.* at 1332. Wells Fargo removed the case to federal court and filed an answer and counterclaim for attorney's fees and costs. *Id.* Perez did not answer the counterclaim. *Id.* at 1333. Wells Fargo refunded Perez $88,000 of the $100,000 that it had frozen, stating the $12,000 difference was for attorney's fees and costs. *Id.* Wells Fargo then filed a motion for judgment on the pleadings, M.R.C.P. 12(c), based on Perez's

24

¶49. Instructive is the case of *Jones v. Fluor Daniel Services Corp.* (*Jones II*), 32 So. 3d 417, 418 (¶3) (Miss. 2010), *overruled on other grounds by Geico Cas. Co. v. Stapleton*, 315 So. 3d 464, 468 (¶14) (Miss. 2021), which generated two appeals. In the second appeal, the Mississippi Supreme Court affirmed the circuit court's ruling that allowed the defendant leave to file an amended answer after the case had been remanded and nearly four years after the complaint was filed. *Id*. at 420 (¶7). In addition, the supreme court affirmed the trial court's grant of summary judgment on the defendant's statute of limitation defense, finding that the defendant had not waived a defense it had raised in its original answer. *Id*. at 421 (¶17).

¶50. The *Jones* litigation began in April 2003 when several black employees sued Fluor Daniel for various claims, including wrongful discharge, negligent infliction of emotional harm, and racial discrimination. *Jones v. Fluor Daniel Servs. Corp.* (*Jones I*), 959 So. 2d 1044, 1045-46 (¶¶2-8) (Miss. 2007). The circuit court granted Fluor Daniel's motion for

---

failure to answer the counterclaim. *Id*. Perez responded to the motion, stating that the failure to answer was due to her attorney being inexperienced in federal court, and also filed a motion to amend the complaint to add breach of contract, conversion, and negligence claims. *Id*. at 1333-34. The district court granted Wells Fargo's motion for judgment on the pleadings and denied the motion to amend due to futility. *Id*. at 1334.

 Perez appealed, and the Eleventh Circuit reversed the trial court's grant of the motion for judgment on the pleadings. *Id*. at 1335. The Eleventh Circuit specifically stated, like our supreme court did in *Franklin*, that while it did not excuse Perez's failure to file an answer to the counterclaim, the grant of a judgment on the pleadings where one party had not filed a pleading amounted to a default judgment without the protections of Rule 55. *Id*. at 1336. The court reasoned that because Perez had shown good cause as to why she did not file an answer, she should have been allowed to file one out of time. *Id*. at 1338. Further, the Eleventh Circuit also went on to grant Perez's motion to amend, adding her new causes of action. *Id*. at 1341-42. This ruling implicitly allowed Perez to not only plead but also present proof on the new causes of action raised.

summary judgment finding that the plaintiffs were at-will employees and that there was no basis for their intentional infliction of emotional harm claims. *Id*. at 1046 (¶2). On appeal, the supreme court affirmed the circuit court's ruling concerning the wrongful discharge claims but reversed and remanded the infliction of emotional harm issue for further proceedings. *Id*. at 1050 (¶24).

¶51. On remand in January 2008, seven months after *Jones I* was issued and nearly five years after the lawsuit was filed, the circuit court allowed Fluor Daniel to file an amended answer. *Jones II*, 32 So. 3d 417, 424 (¶28). Fluor Daniel again moved for summary judgment, contending that the statute of limitations had run on the intentional infliction of emotional harm claims, a defense it had raised in its original answer but had not previously pursued. *Id*. at 421 (¶15). The circuit court granted Fluor Daniel's motion for summary judgment. *Id*. at 419 (¶4). On appeal, the plaintiffs argued, among other things, that the circuit court had erred in allowing Fluor Daniel to file an amended answer, *id*. at 424 (¶28), and that Fluor Daniel had waived the statute of limitations defense (a) because Fluor Daniel only pleaded that their claims "may be" barred by the statute of limitations and (b) because Fluor Daniel had participated in litigation and waited too long to pursue their defense. *Id*. at 420 (¶7).

¶52. To decide the amendment of pleadings issue, the Supreme Court referred to the comment to Rule 15 of the Mississippi Rules of Civil Procedure and stated that "amended pleadings have been liberally permitted through Mississippi's legal history." *Id*. at 424 (¶29). The Court specifically stated that "[t]he grant or denial of a motion for leave to amend is

26

within the sound discretion of the trial court." *Id*. at 424 (¶29) (quoting *MBF Corp. v. Century Bus. Commc'ns Inc.* 663 So. 2d 595, 600 (Miss.1995)). However, "[w]hile the trial court has discretion to allow an amendment and should do so freely under the proper circumstances, an amendment should not be granted when it would prejudice the other party." *Id*. (citing *Hester v. Bandy*, 627 So. 2d 833, 839 (Miss. 1993)). The supreme court rejected the plaintiff's argument that Fluor Daniel had to show "excusable neglect" before being allowed to amend its answer. *Id*. at (¶30). In analyzing this issue, the supreme court relied on *City of Jackson v. Presley*, 942 So. 2d 777 (Miss. 2006), stating:

> In *Presley*, the city had filed its original answer and affirmative defenses on June 28, 1999. Presley, as the plaintiff, filed her amended complaint on June 27, 2000. The city did not file an amended answer until August 5, 2004, more than four years later. This Court reviewed the original and amended complaints and noted that the original complaint and the amended complaint were identical, except for one sentence which was added to the amended complaint. The sentence said, verbatim, "Additionally, Presley has incurred property damage as a proximate result of Morton's negligence and the resulting accident." This Court noted that the untimely-filed answer and affirmative defenses to the amended complaint also virtually mirrored its timely-filed responsive pleading to the original complaint. However, the city did add three additional affirmative defenses. The added defenses were res judicata, accord and satisfaction, and setoff or credit for sums Presley had received in the settlement of the first lawsuit. The Court found it important that, as of the date of the trial, while the city's answer (and affirmative defenses) to the amended complaint unquestionably were filed more than four years late, a default judgment was never requested. This Court found that the defendant should have been allowed to maintain the defenses asserted in the amended answer.

*Id*. at 424 (¶31).[14]

---

[14] *See also Dennis v. United States*, No. 3:16-CV-3148-G, 2017 WL 11496799 (N.D. Tex. Nov. 15, 2017), where a federal district court found that although "the defendant failed to re-assert the affirmative defense" of exhaustion of administrative remedies in his answer to an amended complaint, "because the defendant raised the issue in its initial answer,

27

¶53.  In discussing whether Fluor Daniel had waived its defense, the supreme court noted that there was some uncertainty whether the plaintiffs had actually pleaded an intentional infliction of emotional distress claim because their complaint stated that the defendant's actions constituted a negligent infliction of emotional distress. *Jones II*, 32 So. 3d at 421 (¶12).  As the case proceeded on appeal, the claim became tortious infliction of emotional harm and then intentional infliction of emotional harm. *Id*. at (¶13).  But the supreme court acknowledged that it had ruled in *Mississippi Credit Center Inc. v. Horton*, 926 So. 2d 167 (Miss. 2006), that an eight-month unjustified delay in pursuing a defense, coupled with participation in litigation, constituted a waiver of that defense, *Jones II*, 32 So. 3d at 421 (¶15). The supreme court also stated that such matters are examined on a case-by-case basis. *Id.* Although the trial court did not expound on the reasons for its ruling that the defendant had not waived its defense, after reviewing the record, the supreme court found no abuse of the trial court's discretion to make such a finding. *Id*. at 425 (¶36).

¶54.  Both *Franklin* and *Jones II* authorize trial courts to allow amendment to answers in cases such as the one before us, especially when there is no prejudice to the plaintiff. Further, *Jones II* allows a defendant to pursue a defense plead in its original answer. *Presley* points out that a plaintiff's own delay in challenging the viability of a defense is a factor to be considered.  In the case at hand, William raised the affirmative defenses of estoppel, unclean hands, accord and satisfaction, and voluntary payment in his original answer.  After

---

neither party is prejudiced by the amendment."  *Id*. at *2.  Since neither party would be unfairly prejudiced by the proposed amendment, the defendant had established good cause to allow that defense.  *Id*.

an appeal, the focus on the case was narrowed and sent back to the trial court for further proceedings. However, William had not filed an answer to the second amended complaint. Despite this failure, the parties undertook discovery and prepared for trial. Patsy knew the defenses William planned to raise because he filed a motion for summary judgment arguing each one. Just as in *Presley*, Patsy never took a default or sought a default judgment until the day the trial was to begin. Patsy provided no evidence that she would be prejudiced by the inclusion and trial of these affirmative defenses. Yet the trial court allowed the answer to be filed, but considered the defenses waived. Given the facts of this case, we find the circuit court's ruling an abuse of discretion.

¶55.　"[T]he presentation of a case on its merits should not be defeated by reason alone of any formal rules of pleading and practice, if within the legitimate powers of a court of conscience to avoid it." *Wimley v. Reid*, 991 So. 2d 135, 141 (¶28) (Miss. 2008) (Waller, P.J., concurring in part) (citing *Field v. Middlesex Banking. Co.*, 77 Miss. 180, 26 So. 365 (1899)). This is especially true in cases where the party has clearly presented an intent to defend the case. Further, Patsy was put on notice of these affirmative defenses years before she filed her motion in limine when William filed his original answer, his motions to dismiss, and his motion for summary judgment, all of which raised these defenses in whole or in part. Based on these actions, it cannot be said she would be prejudiced by allowing William to present proof of his claimed affirmative defenses. She was very clearly aware of William's intent to present evidence on these defenses and waited until the day of trial to have the defenses barred. Patsy's actions here amounted to a "*no* trial by ambush." Allowing a

29

plaintiff to drain a defendant of time and energy planning a defense, only to, at the last moment, invalidate all his affirmative defenses based on a long-forgotten responsive pleading goes against the good conscience, and should be avoided if possible.

¶56. In summary, the trial court was correct in allowing William to file an out-of-time answer under *Franklin*. However, the court erred when it refused to allow William to present proof of his defenses of estoppel, unclean hands, and accord and satisfaction. Because William originally pled these affirmative defenses in his original answer, and Patsy was clearly aware of the intent to argue these affirmative defenses at trial, it cannot be said that Patsy would be prejudiced by the allowance of these affirmative defenses.

¶57. Therefore, we reverse the chancery court's order granting Patsy's motion in limine which restricted William from presenting evidence proving his affirmative defenses. We further vacate the court's final judgment, which imposed a constructive trust. We remand for a new trial allowing William to present his affirmative defenses of estoppel, unclean hands, and accord and satisfaction, as these defenses were neither waived nor abandoned.

**2.    Whether the court erred in its finding that William had failed to prove voluntary payment.**

¶58. Turning to William's issue regarding his affirmative defense of voluntary payment, we find that the trial court was correct in allowing him to present proof of this affirmative defense for the same reasons discussed above. However, William also challenges whether the chancery court was correct in its finding that *all* of the mortgage payments that Patsy paid on the subject property were involuntary.

¶59. A voluntary payment is one that is made "[w]ithout compulsion or fraud, and without

30

any mistake of fact, of a demand which the payor does not owe, and which is not enforceable against him[.]" *Colony Ins. Co. v. First Specialty Ins. Corp.*, 262 So. 3d 1128, 1132 (¶8) (Miss. 2019) (quoting *McLean v. Love*, 172 Miss. 168, 157 So. 361, 362 (1934)). A payment may not be considered voluntary unless the payor had "full knowledge of all the facts which would render the payment voluntary." *Id.* (quoting *Glantz Contracting Co. v. Gen. Elec. Co.*, 379 So. 2d 912, 917 (Miss. 1980)). In determining whether payments are voluntarily made, the court should look to the facts of each particular case. *Glantz*, 379 So. 2d at 917-18.

¶60. In December 2008, Patsy demanded that William transfer the subject property to her or she would stop paying the monthly note. Patsy presented evidence at trial, in the form of checks and bank statements, that showed she paid the monthly mortgage note in its entirety. William also testified that he decided not to transfer the property to Patsy, and did not tell her this until after the note was completely paid. Patsy realized that the property had not been transferred when she later tried to sell it. Based on the above facts and evidence, the trial judge correctly determined that Patsy did not have "full knowledge of all the facts which would render the payment voluntary." *Colony Ins. Co.*, 262 So. 3d at 1132 (¶8).

¶61. However, the voluntariness of payments only applied to those that were made *after* Patsy demanded William transfer the property to her. Evidence in the record shows that this demand was made in December 2008 after Patsy had paid six to eight months voluntarily based on the parties' agreement at the RV park. At that time, the parties had agreed that Patsy and Larrye would pay William's bills while he handled the Coastal Bridge litigation.

31

When the litigation lasted longer than Patsy anticipated, she made her unilateral demand for "collateral" and the arrangement changed. While the court was correct in finding that any payments Patsy made after she demanded the transfer of the property were not voluntary, because they were based on the mistaken belief that William had transferred the property into her name, it cannot be said that the payments made prior to that demand were not voluntary.

¶62. The chancery court was made aware of William's proof of the voluntariness of Patsy's earlier payments during argument on William's motion for reconsideration. Actual figures for the amount of credit William was entitled to because of the voluntariness of the earlier payments were presented to the court. While the court seemed to consider this argument during the hearing, the court made no mention of such a credit in its order denying the motion. Patsy admitted she had full knowledge of all of the facts surrounding the payments made between May 2008 and December 2008. She voluntarily made those payments without any fraud or deceit by William. To fail to give William credit for these voluntary payment constitutes an abuse of discretion by the trial court.

¶63. Accordingly, on remand if the trial court still finds enough evidence to support the imposition of a constructive trust after William presents proof of his other affirmative defenses, the court should compute exactly how many of the payments that Patsy made were voluntary. After determining how many of the payments were voluntary, the total amount should be deducted from the debt Patsy paid on the property.

3. **Whether the trial court erred in ordering William to transfer his interest in the twenty-two acres to Patsy.**

¶64. Since William was not able to present his affirmative defenses of estoppel, unclean

32

hands, and accord and satisfaction, this Court is unable to thoroughly examine his constructive trust argument.

> A constructive trust arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or *who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.*

*Sojourner v. Sojourner*, 247 Miss. 342, 353, 153 So. 2d 803, 807 (1963) (emphasis added). If William prevails on either his estoppel, accord and satisfaction, and/or his unclean hands defenses, then the court could not find that he is improperly holding the property. This would call into question whether a constructive trust was established. Therefore, we refrain from deciding whether or not the trial court erred in imposing a constructive trust.

¶65. However, under *In re Estate of Horrigan*, 757 So. 2d 165, 172 (¶34) (Miss. 1999), we can hold with certainty that if on remand the circuit court still finds that a constructive trust was established, it does not have the authority to order a conveyance of the property to Patsy. In *Horrigan*, two grandchildren were approached by their grandparents and urged to invest money, which they had previously been unaware they possessed, into the construction and renovation of their grandparent's house. *White*, 325 So. 3d at 673 (¶26) (quoting *Horrigan*, 757 So. 2d at 167 (¶2)). In exchange, they were promised "they would be willed the entire property after both [their grandfather] and his wife died." *Id*. However, the children were not given the property upon the grandparent's passing. *Id*. The trial court found that this amounted to an abuse of confidence based on the grandparents and grandchildren's relationship, and ordered the imposition of a constructive trust which included a conveyance

33

of the property. On appeal, the supreme court found that a constructive trust was correctly imposed because the grandchildren relied on an agreement from their grandparents which was not upheld. *Id*. at (¶27). "To refuse [the grandchildren] the benefits of the agreement would unjustly enrich" the remaining landowner. *Id*. In imposing a constructive trust, however, the supreme court stated:

> While this Court is unable to grant specific performance in these circumstances, *because the Statute of Frauds barred recovery*, we do hold that as a result of the [grandfather's] conduct, a constructive trust has been created in favor of [the grandchildren] which will continue to exist until such time as they are repaid the [cost of the renovation] plus interest from the date of last payment.

*Id*. (emphasis added) (internal quotations marked omitted). Thus, the supreme court found that, while a constructive trust could and should be imposed on the property in favor of the grandchildren, the trial court could not order a conveyance of the property because the statute of frauds barred such recovery. *Horrigan*, 757 So. 2d at 171 (¶28).

¶66. Similarly, in the present case, William and Patsy had no written agreement concerning the transfer of the property. Therefore on remand, if the trial court does find that a constructive trust should be imposed on the twenty-two acres, it cannot order William to convey it to Patsy. Instead, if a constructive trust is established in favor of Patsy, it should remain until such a time as William pays her what, if anything, she is owed.

**CONCLUSION**

¶67. We find that the trial court erred in refusing to allow William to present evidence or elicit testimony regarding the affirmative defenses of estoppel, unclean hands, and accord and satisfaction. Due to this error, we cannot determine whether a constructive trust was

34

established. However, based on our supreme court's ruling in *Horrigan*, we hold that if the trial court determines a constructive trust should be imposed here, the trial court should not order a conveyance of the land. Rather the trust should remain in place until William pays Patsy the amount owed to her for the land, and this amount should be determined based on how many payments Patsy made that could be considered involuntary, namely those payments made after December 2008.

¶68. Based on these findings, we reverse the trial court's order deeming the affirmative defenses waived and its granting the motion in limine preventing William from being able to present evidence as to these defenses.

¶69. Further, we reverse the trial court's final judgment imposing a constructive trust, and we remand the case to the trial court for a new trial wherein William will be able to present evidence and testify on the affirmative defenses he raised in his answer to the second amended complaint and his original answer (estoppel, unclean hands, accord and satisfaction, and voluntary payment). If the court finds that it should impose a constructive trust, it shall not order transfer of the property but rather shall create a constructive trust on the property until the debt owed is paid.

¶70. Further, concerning the amount of the debt, we affirm the trial court's finding that *some* of the payments were involuntary, but we reverse the trial court's finding that *all* of the payments were involuntary.

¶71. We emphasize that despite William's being able to present testimony and evidence to develop his affirmative defenses, on remand this case is still only to be heard on whether

a constructive trust should be imposed, keeping with our previous holdings and consistent with this opinion.

¶72.    **AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

**BARNES, C.J., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  CARLTON AND WILSON, P.JJ., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**